# IN THE SUPREME COURT OF TEXAS

══════════
No. 13-0435
══════════

CITY OF HOUSTON, PETITIONER,

v.

JAMES & ELIZABETH CARLSON, ET AL., RESPONDENTS

══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
══════════════════════════════════════════════════

**Argued September 18, 2014**


JUSTICE BROWN delivered the opinion of the Court.

JUSTICE WILLETT filed a concurring opinion, in which JUSTICE DEVINE joined.


A group of former condominium owners brings this inverse-condemnation action against the City of Houston, alleging their property was taken when the city ordered residents to vacate the condominium complex. The trial court sustained a plea to the jurisdiction after concluding the owners had not alleged a taking. The court of appeals reversed, and we granted the city's petition for review. Having considered the record and relevant law, we agree with the trial court that the claim must be dismissed.

I

In 2007, a private dispute arose among members of a homeowners association. Park Memorial was a 108-unit condominium complex located in the Rice Military area of Houston. The complex was suffering from an increasing number of cosmetic and structural problems, and the condominium owners disagreed as to how best to address those issues. A majority wanted to market the entire property for redevelopment, but a few refused to sell. In July of 2008, one owner—in an apparent effort to encourage action—informed the City of Houston of certain safety concerns.

The city's subsequent investigation revealed various alleged structural, electrical, and plumbing problems. Of primary concern was evidence that an underground parking facility might fail, posing serious risk to the dozens of units located above the garage. Although the respondents fervently deny that the condominiums were unsafe, the record includes numerous photographs documenting various code violations.

After reviewing the results of its investigation, the city declared the condominiums uninhabitable. Officials posted the following notice throughout the complex:

**N O T I C E**
Public Works & Engineering Department / Code Enforcement

The City of Houston Building Code requires a Certificate of Occupancy to be posted in a conspicuous place on the premises of all commercial buildings.
. . . .
THIS NOTICE WILL ALLOW 10 BUSINESS DAYS FOR YOU TO APPLY
FOR A CERTIFICATE OF OCCUPANCY
. . . .
**Failure to comply with this notice may subject you to a municipal court citation.**

The condominium owners did not apply for an occupancy certificate and did not make the requisite repairs.

After a month passed without compliance, the city opted not to issue a citation. Instead, the city ordered all residents to vacate the complex within thirty-one days. *See* HOUSTON, TEX., BLDG. CODE § 104.12 (2008) (authorizing officials to "order the use discontinued immediately" where a structure "creates a serious and immediate hazard"). At the request of residents and owners, the city conducted an administrative hearing, but then upheld the order to vacate. By December of 2008, all residents had vacated the complex.

After extensive litigation, sixteen property owners—the same owners appearing as the respondents here—ultimately obtained a permanent injunction in March of 2011 when a district court concluded the owners were not afforded due process of law. That court reversed the order to vacate, and a court of appeals affirmed. *See generally City of Houston v. Carlson*, 393 S.W.3d 350 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (holding that the owners had been denied adequate hearing and that the city had failed to follow its own rules). The parties did not seek our review of that decision. Once the order to vacate was lifted, the homeowners association sold the complex for redevelopment.

The group of owners that filed the due-process claim later brought this inverse-condemnation action, alleging that their property was taken when residents were forced to vacate. They seek compensation for years of lost use and for other unspecified damages. The trial court sustained the city's plea to the jurisdiction, concluding that the owners had not alleged a taking. The court of appeals reversed, and the city timely filed a petition for review.

3

II

A municipal government enjoys immunity from suit unless its immunity has been waived. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006) (citation omitted). Without this waiver, courts have no jurisdiction to adjudicate any claim against the municipality. *Id.* It is well settled that the Texas Constitution waives government immunity with respect to inverse-condemnation claims. *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 236 (Tex. 2011). Nevertheless, such a claim is predicated upon a viable allegation of taking. *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012) (citation omitted). "In the absence of a properly pled takings claim, the state retains immunity." *Id.* (citation omitted). Under such circumstances, a court must sustain a properly raised plea to the jurisdiction. *See id.* at 491–92 (dismissing case for lack of jurisdiction after concluding plaintiff had not alleged a taking). With respect to this case, the trial court and court of appeals disagree as to whether the respondents have alleged any taking of property. We review jurisdiction and sufficiency of the pleadings de novo. *See id.* at 476.

The right to acquire and maintain private property is among our most cherished liberties. As Locke explained, the value of private property lies not only in its objective utility, but also in any personal investment therein. *See* JOHN LOCKE, TWO TREATISES OF GOVERNMENT 134 (Thomas I. Cook ed., Hafner Press 1947) (1689). Accordingly, the right to undisturbed enjoyment of residential property is all the more sacred. The unique importance of the home is reflected in our Bill of Rights, which protects us from uncompensated dispossession, unwarranted search, and unwanted guests. *See* U.S. CONST. amends. III, IV, V. This Court, in particular, has long recognized the undisturbed

4

enjoyment of private property as "a foundational liberty, not a contingent privilege." *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Texas*, *LLC*, 363 S.W.3d 192, 204 n.34 (Tex. 2012).

The preservation of these property rights is "one of the most important purposes of government." *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977). But government has other obligations as well, including ensuring the safety and security of its citizenry. *See Kelley v. Johnson*, 425 U.S. 238, 247 (1976) (referring to "safety of persons and property"). To satisfy its responsibilities, government often imposes restrictions on the use of private property. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 125 (1978) (recognizing that regulations are used to promote "health, safety, morals, [and] general welfare") (citation omitted). Although these restrictions sometimes result in inconvenience to owners, government is not generally required to compensate an owner for associated loss. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change . . . ." *Id.* at 124 (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)).

Nevertheless, when regulation of private property "reaches a certain magnitude . . . there must be an exercise of eminent domain and compensation to sustain the act." *Mahon*, 260 U.S. at 413; *see also* U.S. Const. amend. V (requiring "just compensation"); Tex. Const. art. I, § 17 (requiring "adequate compensation"); *Hearts Bluff*, 381 S.W.3d at 477 (explaining that Texas takings jurisprudence is "consistent with federal jurisprudence"). Where a property owner believes compensation is due, he may seek redress via an inverse-condemnation claim. *State v. Hale*, 146 S.W.2d 731, 735 (Tex. 1941). To plead inverse condemnation, a plaintiff must allege an intentional government act that resulted in the uncompensated taking of private property. *See City of Abilene*

*v. Burk Royalty Co.*, 470 S.W.2d 643, 647 (Tex. 1971) (listing elements of inverse condemnation); *Hale*, 146 S.W.2d at 736 (requiring intent). A taking is the acquisition, damage, or destruction of property via physical or regulatory means. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998); *Hale*, 146 S.W.2d at 736.

Although the respondents insist they have suffered a regulatory taking, their allegations do not support that claim. A regulatory taking is a condition of use "so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (citation omitted). Yet the respondents do not contest any of Houston's property-use restrictions. They do not argue that it is unreasonable to require multi-family residential facilities to obtain occupancy certificates. They do not challenge the city's electrical, plumbing, or structural standards. Nor do they suggest that these standards are so burdensome as to interfere with the use of their property. In fact, the respondents' petition never once refers to the standards imposed by the city's building code.

Instead, the respondents object only to the penalty imposed and the manner in which the city enforced its standards. The respondents complain, for example, that the city did not specify the alleged violations and that the punishment was excessive. They argue that the safety regulations were misapplied vis-à-vis their property. They further insist—and the courts ultimately confirmed—that the city's procedure failed to afford the condominium owners constitutionally adequate notice or hearing. Although these are troubling assertions, they do not implicate any property-use restriction. The only regulation challenged is a procedural one. *See* HOUSTON, TEX., BLDG. CODE § 104.12

6

(2008) (authorizing orders to vacate). Accordingly, even accepting all pleaded facts as true, the respondents have not alleged a taking.

The respondents appear to suggest that a civil-enforcement procedure alone can serve as the basis of a regulatory-takings claim. They have identified no authority for such a proposition. Historically, takings compensation was afforded only where the government physically acquired or destroyed private property. The U.S. Supreme Court did not recognize regulatory takings until 1922, when a newly enacted Pennsylvania statute prohibited any coal mining that might cause subsidence of certain surface structures. *Mahon*, 260 U.S. at 412–13. The *Mahon* Court found the statute to be a permissible exercise of the state's authority. *Id*. at 414. Nevertheless, the Court required the state to compensate mineral owners for any loss, reasoning that the use restriction was equivalent to "appropriating or destroying [the coal]." *Id.* at 414–15. In so holding, the Court emphasized both the regulatory context and the narrowness of the decision's reach. *See id.* at 415 ("[W]hile *property* may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking.") (emphasis added), 416 (eschewing "general propositions" and differentiating other circumstances).

In the intervening decades, the Court has applied regulatory takings analysis only to regulation of property. *See, e.g.*, *Penn Cent.*, 438 U.S. at 125 (limiting its discussion to "land-use regulations"). To our knowledge, neither the U.S. Supreme Court nor this Court has ever recognized a purely procedural regulatory taking. Granted, the respondents offer a host of cases as ostensible support for their position.[1] The cases are inapposite. In each of those disputes, the aggrieved party

---

[1] *See First English Evangelical Lutheran Church of Glendale v. L.A. Cnty.*, 482 U.S. 304 (1987); *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532 (Tex. 2013); *Steele v. City of Houston*, 603 S.W.2d 786 (Tex. 1980); *Hale*, 146 S.W.2d at 736; *Smith v. City of League City*, 338 S.W.3d 114 (Tex. App.—Houston [14th Dist.] 2011, no

raised a direct challenge to a physical taking or land-use restriction. In addition, that party also objected to the procedure used to facilitate the disputed action. Here, the aggrieved party challenges the latter but not the former. So while the respondents may be correct that "numerous cases involve both due-process violations and a takings claim," this case is not among them.

We do not doubt, and the city does not deny, that the order to vacate interfered with the use of the respondents' property. Yet nearly every civil-enforcement action results in a property loss of some kind. The very nature of the action dictates as much. Nevertheless, that property is not "taken for public use" within the meaning of the Constitution.[2] Accordingly, where a party objects only to the "infirmity of the process," no taking has been alleged. *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 893–94 (6th Cir. 1991) (quoting *Hammond v. Baldwin*, 866 F.2d 172, 176 (6th Cir. 1989)) (other citations omitted). Further, it is immaterial that the city may have been mistaken regarding the actual safety of the complex. Even assuming the city made a mistake, the respondents' allegations would "amount to nothing more than a claim of negligence on the part of [the city], for which [it] is immune under the Texas Tort Claims Act." *Dalon v. City of DeSoto*, 852 S.W.2d 530, 538 (Tex. App.—Dallas 1992, writ denied). So while the facts alleged here might support a due-process action or perhaps a colorable claim under 42 U.S.C. § 1983, those allegations do not give rise to the takings claim necessary to establish a viable inverse-condemnation case.

pet.); *City of San Antonio v. El Dorado Amusement Co., Inc.*, 195 S.W.3d 238 (Tex. App.—San Antonio 2006, pet. denied); *Patel v. City of Everman*, 179 S.W.3d 1 (Tex. App.—Tyler 2004, pet. denied); *Tex. Parks & Wildlife Dep't v. Callaway*, 971 S.W.2d 145 (Tex. App.—Austin 1998, no pet.).

[2] *See González-Álvarez v. Rivero-Cubano*, 426 F.3d 422, 430 (1st Cir. 2005) ("The quota cancellation was a sanction[,] . . . not a taking of private property for public use . . . . We fail to see how the cancellation . . . is different from any other fine or forfeiture imposed under state law consequent to engaging in some harmful activity.") (emphasis omitted).

* * *

In emphasizing the procedural nature of the dispute before us, we do not mean to suggest that due-process claims and takings claims are mutually exclusive. The city insists as much, and asks us to hold that an inverse-condemnation claim presumes due process of law. We decline the city's invitation to do so, as we need not consider the argument. As the U.S. Supreme Court has explained, a due-process inquiry "is logically prior to and distinct from the question whether a regulation effects a taking." *Lingle*, 544 U.S. at 543. Consequently, the respondents' inverse-condemnation claim fails not because they have already prevailed on a due-process claim, but because they simply have not alleged a taking. The city therefore retains its immunity from suit. *Hearts Bluff*, 381 S.W.3d at 476. Accordingly, we reverse the court of appeals and dismiss this case for want of jurisdiction.

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED: December 19, 2014

9