# NO. 12-19-00172-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *NECHES AND TRINITY VALLEYS GROUNDWATER CONSERVATION DISTRICT, APPELLANT* | § | *APPEAL FROM THE 2ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *MOUNTAIN PURE TX, LLC, APPELLEE* | § | *CHEROKEE COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

This is an accelerated appeal from the district court's denial of Neches and Trinity Valleys Groundwater Conservation District's plea to the jurisdiction alleging governmental immunity. In three issues, the District challenges the denial of its plea to the jurisdiction and its no evidence motion for partial summary judgment. Because we conclude that Mountain Pure TX, LLC's counterclaim against the District is barred by governmental immunity, we reverse the order of the trial court, render judgment dismissing Mountain Pure's counterclaim, and remand the cause to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

The District is a groundwater conservation district charged with the duty to conserve, preserve, and prevent waste of groundwater in Cherokee, Anderson, and Henderson Counties.[1] Its powers also include the authority to make and enforce rules.[2] Its rules require all persons owning a groundwater well to obtain permits to drill and operate the well unless exempt under the

---

[1] TEX. WATER CODE ANN. § 36.0015(b) (West 2018); TEX. SPEC. DIST. LOCAL LAWS CODE ANN. § 8863.002.

[2] TEX. WATER CODE ANN. §§ 36.101(a), 36.102 (West 2018).

provisions of Chapter 8863 of the Texas Special District Local Laws. Chapter 8863.151 permits the District to assess production fees.[3] Chapter 8863.103 permits the District to require a permit for the transfer of groundwater out of the district.[4]

Mountain Pure owns a spring water bottling plant in Palestine, Texas. Mountain Pure refused to acknowledge that it owns or operates a water well, refused to apply for a permit to operate a water well, refused to apply for the transfer of water out of the district, and failed to file quarterly production reports or pay quarterly production fees. Mountain Pure maintained that the water it bottled and sold did not come from a water well, but from an "underground formation from which water flows naturally to the surface of the earth." It is Mountain Pure's position that the District therefore has no authority to regulate spring water.

The District, claiming that Mountain Pure was drawing water from a well under its authority, filed suit against Mountain Pure and Ice River Springs Palestine, LLC to force their compliance with the Texas Water Code and the District's rules. The District asked the trial court to order Mountain Pure and Ice River to (1) submit to the District within thirty days applications for operating permits for all of their wells; (2) submit to the District within thirty days written reports stating the amount of groundwater produced from their wells for all quarters beginning with the first quarter of 2008; (3) cease from operating nonexempt wells in Anderson County without accurately metering the amount of water produced; (4) accurately report the amount of water produced from all of its wells to the District on a quarterly basis; and (5) pay to the District within thirty days all production fees due as determined by the quarterly reports required. The suit also asked for reasonable costs, attorney fees, and the assessment of civil penalties. Ice River, a tenant of Mountain Pure, was subsequently dismissed from the case.

Mountain Pure generally denied the District's allegations and filed a counterclaim alleging that the District's enforcement attempts constituted tortious interference with their lucrative operating contract with Ice River. In its counterclaim, Mountain Pure stated that prior to the District's filing suit, Ice River contracted to purchase the facility. Ice River was also operating the facility and making substantial payments to Mountain Pure. Mountain Pure alleged that before filing suit, the District informed Ice River "that a $10,000 per day fine was being assessed because

---

[3] Tex. Spec. Dist. Local Laws Code Ann. § 8863.151(c).

[4] Tex. Spec. Dist. Local Laws Code Ann. § 8863.103(b).

2

of an unreported and unmonitored water well that was drilled on the property." Mountain Pure further alleged "[a]s a result of this communication, Ice River Springs Palestine, LLC practically overnight withdrew from the facility and abandoned operation of the plant and quit making payments under the terms of the written agreement." Mountain Pure alleged that the District, by its actions, tortiously interfered with its contract with Ice River which resulted in $10,000,000 in damages to Mountain Pure from lost earnings and/or lost earning capacity, lost profits, and diminished market value.

In its First Amended Counterclaim, in addition to the tortious interference claim, Mountain Pure alleged a general takings claim based on the same facts and same damages as the tortious interference claim. The trial court granted the District's plea to the jurisdiction as to the tortious interference claim but denied its plea to the jurisdiction as to the takings claim.

In its Sixth Amended Counterclaim, Mountain Pure contended that the District's attempted regulation caused Ice River's withdrawal from the contract to operate the facility for Mountain Pure, denied access to the property, and caused a cessation of operations. The nature and amount of the damages are the same as those formerly claimed.

The District, in its Third Plea to the Jurisdiction, maintained that Mountain Pure simply complained about the District enforcing its regulations and failed to allege a takings claim. The trial court denied the District's plea to the jurisdiction. The District appealed the interlocutory order.

No rules or restrictions have as yet been imposed on Mountain Pure or its property and the question of the District's authority over the source of Mountain Pure's water remains pending before the trial court.

#### PLEA TO THE JURISDICTION

In two issues, the District claims the trial court erred in not granting its plea to the jurisdiction and dismissing Mountain Pure's counterclaim. In a third issue, the District contends the trial court erred in denying its no evidence motion for partial summary judgment.

**Standard of Review**

Subject matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). A challenge to subject matter jurisdiction presents a question of law. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133

S.W3d 217, 226 (Tex. 2004). Therefore, we review the trial court's ruling on a plea to the jurisdiction de novo. **Mayhew v. Town of Sunnyvale**, 964 S.W.2d 922, 928 (Tex. 1998). In reviewing a plea to the jurisdiction, we review the pleadings and any evidence relevant to the jurisdictional issue. *See* **Tex. Dep't of Criminal Justice v. Miller**, 51 S.W.3d 583, 587 (Tex. 2001). We accord the trial court's decision no deference. **Quick v. City of Austin**, 7 S.W.3d 109, 116 (Tex. 1998). The plaintiff's pleadings are construed liberally in the plaintiff's favor. **Miranda**, 133 S.W3d at 226. But it is the factual substance of the pleadings (as supported by the jurisdictional evidence) that is controlling when we review the trial court's ruling on a plea to the jurisdiction. **Nat'l Media Corp. v. City of Austin**, No. 03-16-00839-CV, 2018 WL 1440454 at *5 (Tex. App.—Austin Mar. 23, 2018, no pet.) (mem. op.) (citing **Andrade v. NAACP of Austin**, 354 S.W.3d 1, 11 (Tex. 2011)).

**Applicable Law**

Under the doctrine of sovereign immunity, the State of Texas cannot be sued in its own courts without its consent and then only in the manner indicated by that consent. **Wichita Falls State Hosp. v. Taylor**, 106 S.W.3d 692, 694 (Tex. 2003). Absent the State's consent to suit, a trial court lacks subject matter jurisdiction. **Tex. Dep't of Transp. v. Jones**, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam). "Sovereign immunity does not shield the government from liability for compensation under the takings clause." **Harris Cty. Flood Control Dist. v. Kerr**, 499 S.W.3d 793, 799 (Tex. 2016). Governments must sometimes impose restrictions on and regulations affecting the use of private property in order to secure the safety, health, and general welfare of its citizens. *See* **City of Houston v. Carlson**, 451 S.W.3d 828, 831 (Tex. 2014). Although those restrictions and regulations sometimes result in inconvenience to owners, the government is not generally required to compensate for accompanying loss. **Id**. But when regulation of private property reaches a certain level there must be an exercise of eminent domain and compensation to sustain that act. **Id**. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." **Pennsylvania Coal Co. v. Mahon**, 260 U.S. 393, 415, 43 S. Ct. 158, 160, 67 L. Ed. 2d 322 (1922). Where a property owner believes compensation is due, he may seek redress via an inverse condemnation claim. **Carlson**, 451 S.W.3d at 831; **State v. Hale**, 136 Tex. 29, 146 S.W.2d 731, 735 (1941).

The Texas Constitution waives sovereign immunity with regard to inverse condemnation claims. **Carlson**, 451 S.W.3d at 830. Such claims must be predicated upon a viable allegation of

4

a taking. *Id*. Absent a properly pleaded takings claim, the government retains immunity, and a court must sustain a properly raised plea to the jurisdiction. *Id*.

A taking is the acquisition, damage, or destruction by physical or regulatory means. *Id*. at 831; *Mayhew*, 964 S.W.2d at 933. A physical taking occurs when the government authorizes an unwarranted physical occupation of a person's property. *Mayhew*, 964 S.W.2d at 933.

A compensable regulatory taking may occur in one of two ways. First, a regulatory taking can occur when governmental agencies impose restrictions that deny landowners all economically viable use of their property. *Id*. at 935. A restriction denies the landowner all economically viable use of the property if the restriction renders the property valueless. *Id*. Second, a regulatory taking can occur if the restrictions imposed unreasonably interfere with the landowners' right to use and enjoy the property. *Id*.

In determining whether the government unreasonably interfered with an owner's right to use and enjoy the property, two factors must be considered: the economic impact of the regulation and the extent to which the regulation interferes with distinct investment backed expectations. *Id*. "The first factor, the economic impact of the regulation, merely compares the value that has been taken from the property with the value that remains in the property." *Id*. at 935-36. The loss of anticipated gains or potential future profits is not usually considered in analyzing this factor. *Id*. at 936. The second factor is the reasonable investment-backed expectation of the landowner. *Id*. "The existing and permitted uses of the property constitute the 'primary expectation' of the landowner that is affected by regulation." *Id*.

A civil enforcement procedure alone cannot serve as the basis of a regulatory takings claim. *Carlson*, 451 S.W.3d at 832-33; *CPM Trust v. City of Plano*, 461 S.W.3d 661, 673 (Tex. App.—Dallas 2015, no pet.).

A denial of access is compensable if the denial of access is substantial and material. *See City of Houston v. Texan Land and Cattle Co*., 138 S.W.3d 382, 387 (Tex. App.—Houston [14th Dist.] 2004, no pet.). In order to show substantial and material impairment of access, the owner must establish (1) a total temporary restriction of access, (2) a partial permanent restriction of access, or (3) a partial temporary restriction of access due to illegal or negligent activity. *State v. Schmidt*, 867 S.W.2d 769, 775 (Tex. 1993); *Texan Land and Cattle Co*., 138 S.W.3d at 387.

5

**Discussion**

Mountain Pure does not contend that the District's rules and regulations it seeks to enforce are unconstitutional or otherwise invalid. But it maintains that the District is wrongfully attempting to apply them to its property. Mountain Pure claims the spring catch basin from which it derives the water to be bottled and sold is not a water well within the purview of the District's rules and the water taken from the basin is not groundwater subject to the District's rules. The dispute as to whether the District's rules apply to Mountain Pure's facility remains unresolved. Therefore, as yet, no rules or restrictions have been imposed on Mountain Pure or its property.

However, in its counterclaim, Mountain Pure claims a permanent taking occurred when the District filed suit against it and its tenant and operator, Ice River, to enforce its regulations applicable to groundwater. The District's rules required the reporting of the amount of groundwater produced and the payment of a production fee in the amount of three cents for every 1000 gallons shipped out of the District. Failure to pay the production fee results in fines, such as the fine of up to $10,000 per day assessed against Mountain Pure. This initial step in the enforcement process, Mountain Pure asserts, caused Ice River to withdraw from a lucrative contract with Mountain Pure to use and operate the spring. The loss of this contract, it argues, resulted in the cessation of operations at the spring, and the loss of a minimum of $10,000,000.

Mountain Pure does not dispute that the District has governmental immunity but contends that under the Fifth Amendment of the United States Constitution and Article I, Section 17 of the Texas Constitution, the District is not shielded against a properly pled takings claim. When a property owner believes the government's conduct amounts to a taking for which he is entitled to compensation, he may file an inverse-condemnation claim. *Carlson*, 451 S.W3d at 831; *Hale*, 146 S.W.2d at 735. Takings can be either physical or regulatory takings. *Mayhew,* 964 S.W.2d at 933.

Mountain Pure maintains that the District's suit resulted in a permanent regulatory taking by unreasonably interfering with its right to use and enjoy its property. The record shows that Mountain Pure's Palestine plant, after the government action, retains a value of $4,090,000. Mountain Pure cannot contend that the District's action renders its property valueless. Mountain Pure obviously cannot claim a regulatory taking by claiming the District's actions would take "all economically viable use of its property by rendering it valueless.

6

As previously stated, two factors must be considered in determining whether the government-imposed restrictions constitute a regulatory taking by unreasonably interfering with the landowners' rights to use and enjoy their property. *Id*. The economic impact of the regulation on the property is the first factor. This "merely compares the value that has been taken from the property with the value that remains in the property." *Id*. at 936. The loss of anticipated gains or future profits is not usually considered in this analysis. *Id*. Mountain Pure's spring and related facilities retain a value, according to its appraiser, of $4,090,000. Mountain Pure's pleadings and the jurisdictional evidence indicate that the loss it claims to the value of its property is the result of the loss of future gains from its lost contract with Ice River. The appraiser's report Mountain Pure submitted in its response to the District's plea to the jurisdiction and motion for summary shows a total value loss of $5,780,000 "attributable to the early lease termination by Ice River."

The second factor to be considered is the extent to which the regulation interferes with the "investment-backed expectation of the landowner." *Id*. "The existing and permitted uses of the property constitute the 'primary expectation' of the landowner affected by regulation." *Id*. (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 136, 98 S. Ct. 2646, 2665, 57 L. Ed. 631 (1978)). There is no pleading or evidence that Mountain Pure has pleaded or shown that the application of the groundwater rules, should they be held to apply, will interfere with production and sale of bottled water from the property. If the District is successful, the enforcement of the production reporting rules would represent a restriction on the property's use. There is no pleading that the imposition of a three cent per 1000 gallons fee will be so onerous as to affect the present use of the property or significantly diminish its economic viability. Even if it could be conceded that the application of the District's rules and regulations might affect the potential attractiveness of the property, the United States Supreme Court has observed neither a diminution in property value nor a "substantial reduction of the attractiveness of the property to potential purchasers' will suffice to establish that a taking has occurred." *Exposito v. S. Carolina Coastal Council*, 939 F.2d 165, 170 (4th Cir. 1991) (quoting *Kirby Forest Indus. v. United States*, 467 U.S. 1, 15, 104 S. Ct. 2187, 2196, 81 L. Ed. 2d 1 (1984)).

Mountain Pure's primary expectation concerning the use of the property was the bottling of spring water. Neither the District's rules nor its attempt at their enforcement has deprived Mountain Pure of any reasonable investment backed expectation. There is no showing that the enforcement of the reporting rules and the accompanying three cent per thousand-gallon fee will

7

affect production. Mountain Pure retains the right to occupy the property, to exclude others from it, to continue to operate the spring on the property, or to alienate it should it choose. The current industrial use is permissible and there are no known private or other restrictions limiting the use of the property according to Mountain Pure's appraiser's report. An analysis of the pleadings and jurisdictional evidence under this factor fails to show a regulatory taking.

Mountain Pure's appraiser showed the property is presently worth $4,090,000. Mountain Pure has simply pleaded that because of the District's threat to enforce its rules, Ice River withdrew from its contract to operate the facility. Its appraiser's report shows that this resulted in a $5,780,000 loss attributable to Ice River's decision to withdraw from the lease according to Mountain Pure's appraisers. Its claim that the District is wrongfully attempting to misapply its rules to Mountain Pure's spring demonstrates that the District's suit is a civil enforcement action. A civil enforcement action alone cannot serve as the basis of a regulatory takings claim. *See Carlson*, 451 S.W.3d at 832-33; *see also CPM Trust*, 461 S.W.3d at 673.

There are assertions in Mountain Pure's pleadings that the District denied access to the property and caused a cessation of operations. Mountain Pure's pleadings do not contain facts that allege a compensable denial of access, nor do they show how the District's suit forced a cessation of operation. Ice River's termination of its lease purchase operating agreement may have been influenced by the District's civil enforcement suit. But there are no facts pleaded to show it was required by the District's action. The District's suit neither denied access to the spring nor prevented its operation. No restrictions, rules, or regulations affecting it have so far been applied to the property. Mountain Pure's pleadings and the facts in the record show that the damage claims relate solely to their loss of the "above market" contract with Ice River. They allege the same facts and damages as Mountain Pure's dismissed tortious interference claim with a conclusory takings claim appended. It is impossible to avoid the conclusion that Mountain Pure's inverse condemnation claim is no more that its dismissed tortious interference claim thinly disguised as a taking.

While Mountain Pure's pleadings recite that the District's actions effectuated a total regulatory taking by unreasonably interfering with Mountain Pure's use and enjoyment of the property, it is the facts pleaded and supported by the jurisdictional evidence that is controlling. Natl' Media Corp. 2018 WL 1440454, at *5 (citing *Andrade*, 345 S.W.3d at 11). The facts pleaded fail to show a taking.

8

For the above reasons, we conclude the trial court erred by denying the District's plea to the jurisdiction. We sustain issues one and two. Our disposition of the District's first two issues renders it unnecessary that we address the District's third issue. *See* TEX. R. APP. P. 47.1.

## DISPOSITION

Because the trial court erred in denying the District's plea to the jurisdiction and motion to dismiss Mountain Pure's counterclaim, we *reverse* the trial court's order of denial, *render* judgment dismissing Mountain Pure's takings claim against the District, and *remand* the cause to the trial court for further proceedings consistent with this opinion.

**BILL BASS**
Justice

Opinion delivered September 18, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Bass, Retired, J., Twelfth Court of Appeals, sitting by assignment.*

(PUBLISH)

9



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**SEPTEMBER 18, 2019**

**NO. 12-19-00172-CV**

**NECHES AND TRINITY VALLEYS
GROUNDWATER CONSERVATION DISTRICT,**
Appellant
V.
**MOUNTAIN PURE TX, LLC,**
Appellee

Appeal from the 2nd District Court

of Cherokee County, Texas (Tr.Ct.No. 2016-08-0543)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the order of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the order of the trial court be **reversed,** Mountain Pure's counterclaim be **dismissed,** and the cause be **remanded** to the trial court **for further proceedings**  and that all costs of this appeal are hereby adjudged against the Appellee, **MOUNTAIN PURE TX, LLC,** in accordance with the opinion of this court; and that this decision be certified to the court below for observance.

Bill Bass, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Bass, Retired J., Twelfth Court of Appeals, sitting by assignment.*