

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BUFORD-THOMPSON COMPANY, LLC d/b/a BTC, | § | No. 08-24-00040-CV |
| | § | Appeal from the |
| Appellant, | | |
| | § | 112th District Court |
| v. | | |
| | § | of Upton County, Texas |
| RANKIN INDEPENDENT SCHOOL DISTRICT, | § | (TC# 23-231-DCCV- 05050) |
| Appellee. | § | |

## <u>MEMORANDUM OPINION</u>

Appellant Buford-Thompson Company (BTC) was awarded a substantial construction contract by the Rankin Independent School District (District). BTC admits it distributed expensive gifts to various District officials and board members in the timeline leading up to its award of the contract. After discovering the gifts and BTC's alleged failure to disclose them as mandated by statute, the District declared the contract void. Significantly, the declaration occurred (1) eleven months into the construction project when BTC's outstanding costs exceeded $1 million; (2) two months after BTC had itself terminated the contract; and (3) several weeks after BTC filed suit for breach of contract against the District. Claiming any disclosure violations were cured, BTC argues the validity of the contract presents a fact question on the waiver of governmental immunity and,

thus, the trial court erred in granting the District's plea to the jurisdiction. We disagree and affirm the trial court's ruling.

# I. BACKGROUND[1]

## A. BTC gifts to district employees and board members pre-contract

In January 2023, the District awarded BTC the contract to serve as Construction Manager for the District's $59 million 2022 Bond Project, which included a new transportation facility and gymnasium. At the time, BTC had operated in the public sector for 40 years, and held itself out as "the premier K-12 education construction manager in Texas."[2]

Prior to the contract award, and while actively seeking the District's approval for work on various bond projects, BTC distributed the following gifts to District officials and board members:

- November 14, 2021: Dallas Cowboys tickets, parking pass and suite access to Superintendent Samuel Wyatt and family;

- May 22, 2022: NASCAR tickets, parking pass and suite access to Superintendent Samuel Wyatt and his wife, Dawn Wyatt, Business Manager;

- May 22, 2022: NASCAR tickets and suite access to Tracy Clanton, Facilities and Maintenance Manager;

- October 15, 2022, and October 18, 2022: Tickets for NASCAR event and limousine transport service in Las Vegas to Superintendent Samuel Wyatt and Business Manager Dawn Wyatt;

---

[1] These background recitations are taken largely from the reporter's record and the appellate briefs. Because the matter below was dismissed on a plea to the jurisdiction, the substantive allegations have yet to be proven.

[2] *See* District's First Amended Plea to the Jurisdiction and Motion to Dismiss, filed December 14, 2023, citing https://btcbuilds.com/ (last visited November 20, 2023).

- October 30, 2022: Dallas Cowboys tickets, parking pass and suite access to Superintendent Samuel Wyatt and Business Manager Dawn Wyatt;

- October 30, 2022: Dallas Cowboys tickets to Board Member Jimmy Armendariz;

- October 30, 2022: Dallas Cowboys tickets and suite access to Board Member Brett Clark; and

- October 30, 2022: Dallas Cowboys tickets and suite access to Principal Brad Riker.

**B.  BTC failure to comply with statutory disclosure requirements pre-contract**

In November 2022, District voters approved a $223 million bond measure to finance substantial school construction and renovation projects (the Project). On November 9, 2022, BTC submitted a Request for Qualifications (RFQ) to District Superintendent Sammy Wyatt for the Bond Projects; in violation of federal regulations, BTC itself intended to respond to the form.[3] BTC's proposal included specific reference to the disclosure requirements and Conflicts of Interest questionnaire (CIQ) mandated for completion by Chapter 176 of the Texas Local Government Code (Chapter 176).[4] *See* Tex. Loc. Gov't Code Ann., § 176. The District then publicly released its final RFQ, which also included the Chapter 176 mandate that all proposers execute the CIQ under oath. BTC received the District's final Request for Proposal (RFP) for Construction Manager on the Bond Projects on November 18, 2022.

On December 2, 2022, BTC submitted its response to the District's RFP, along with the completed CIQ disclosure form mandated by Chapter 176. Despite BTC's distribution of gifts to

---

[3] Contractors do not generally draft the public entity bids to which they will ultimately respond as doing so would violate federal procurement standards which "ensure objective contractor performance and eliminate unfair competitive advantage." *See* 2 CFR § 200.319. "[C]ontractors that develop or draft specifications, requirements, statements of work, or invitations for bids must be excluded from competing on those procurements." *See id.* § 200.319(b).

[4] Texas Local Government Code § 176.006 requires a vendor to complete a Conflict of Interest questionnaire (CIQ) with the governmental entity no later than seven business days after the submission of any proposal to contract with that particular entity. The questionnaire requires the vendor to disclose any gifts made to public officials and valued at $100 or more in aggregate value in the preceding twelve-month period. *See id.* § 176.003(a)(2)(B).

District officials less than six weeks earlier, the CIQ, signed under oath by BTC President Sammy Martin, indicated no disclosures were necessary. Less than two weeks later, on December 17, 2022, BTC gifted limousine transportation service to the District's Superintendent Samuel Wyatt and Business Manager Dawn Wyatt.

BTC was awarded the contract to serve as Construction Manager for the Project on January 3, 2023. The District received no other proposals. On February 8, 2023, BTC and the District executed a "guaranteed maximum price" amendment to the contract, which included the dates for work commencement and substantial completion. The District then timely paid BTC's first two payment applications: (1) $195,378.90 for February 2023; and (2) $1,094,495.95 for March 2023.

### C. District discovers BTC non-disclosures

In April 2023, based on public concern and inquiry, the District's Board of Trustees (Board) became aware of BTC's previously undisclosed gifts to District employees and officials. During a special meeting on May 2, 2023, the Board discussed the statutory disclosure requirements and BTC's undisclosed gifts. The Board president then reached out to BTC regarding the undisclosed gifts.[5]

During another special meeting on May 9, 2023, the Board voted to temporarily halt BTC work on the Project. That same day, the Board accepted the resignations of Superintendent Samuel Wyatt and Business Manager Dawn Wyatt, stemming from their acceptance of BTC gifts. On May 10, 2023, the District notified BTC in writing that the Project was being "suspended, as follows:"

---

[5] According to his January 2024 Affidavit, BTC CEO Michael Trammell claims BTC amended its disclosures via April 28, 2023, and May 1, 2023 CIQs. Trammell admits that the disclosures made in the alleged April 2023 and May 2023 CIQs were incomplete. The alleged April 2023 and May 2023 CIQs are not in the record.

> [T]he RISD board moved last night to temporarily halt construction on our bus barn project. I asked last week that we stop design and engineering but at this time we'd actually like you to stop work. We'd like to get our interim [superintendent] in place before we pour any more concrete. We so appreciate your help and we expect to get back rolling very quickly.

According to BTC, the District's notification did not "terminate" the contract for convenience or for cause as required. The notification also made no mention of BTC's alleged failure to file CIQ disclosures. Still, pursuant to the District's notice, BTC suspended work; work remained suspended for the entire summer of 2023.

On May 16, 2023, the Board voted to retain a forensic auditor to investigate the validity of the contract based on the BTC conflict-of-interest disclosure issues.

### D. BTC terminates the contract and files suit; district voids the contract

After giving seven days' notice, BTC terminated the contract on September 19, 2023.[6] Upon termination, BTC claimed the District owed $1,157,970.25 on the Project. That same day, BTC filed its lawsuit alleging breach of contract claims against the District.

Less than a month later, on October 11, 2023, the Board received the forensic auditor's results, including the conclusion that BTC had failed to disclose "potentially illegal" gifts given to District officials and employees pre-contract, as mandated by Chapter 176. Based on the auditor's recommendations, the Board declared the BTC contract void *ab initio* (from inception) under

---

[6] The District may have previously terminated the contract. On September 6, 2019, the District relayed preliminary audit findings pertaining to portions of the project to BTC. The findings included cost overages and instances of potential savings to the District, which had not been realized by BTC, totaling $959,823. With the findings, the District put BTC on notice that the alleged contract was terminated. Upon receipt of the District's notice, BTC counsel denied any compliance issues, and explained the District's allegations were insufficient for termination.

Chapter 176 on November 28, 2023.[7] The next day, November 29, 2023, the District filed its answer, plea to the jurisdiction and motion to dismiss BTC's suit.[8]

BTC claimed the District's voiding of the contract "was the first time BTC had received notice [from the District] of [BTC's] alleged violation of [Chapter] 176." On that basis, BTC mailed a supplemental CIQ with an enclosure letter dated November 28, 2023. Despite its date, the letter indicates the supplemental CIQ was prepared in response to the District's notification in pleadings "filed yesterday, November 29, 2023;" the signature on the CIQ is dated November 30, 2023. In this supplemental CIQ, BTC disclosed only those gifts to former District employees Samuel and Dawn Wyatt. While stating the supplemental disclosure was "admittedly" late, BTC explained that was "because [BTC] was unaware of the filing requirement for these gifts."

### E. Trial court findings and grant of plea to jurisdiction

On February 6, 2024, the trial court heard the District's Plea and Motion. District counsel argued the trial court lacked jurisdiction because BTC could not establish a waiver of governmental immunity. BTC counsel claimed the breach of contract cause of action in and of itself provided grounds for waiver; and that Chapter 176 expressly instructed that the contract's validity could not be affected solely by BTC's alleged non-compliance with the disclosure requirements. On that issue, BTC counsel further claimed BTC had "cured" any statutory violation after first receiving notice from the District that the disclosures had not been made.

In response, District counsel explained that pursuant to Chapter 176's enforcement authority, the District's declaration that the contract was void meant the contract was void at

---

[7] *See* Tex. Loc. Gov't Code Ann. § 176.013(e) ("The governing body of a local governmental entity may, at its discretion, declare a contract void if the governing body determines that a vendor failed to file a conflict of interest questionnaire required by Section 176.006.").

[8] Before us in this appeal is the amended plea and motion to dismiss filed in mid-December 2023.

inception; thus, there was no valid contract when BTC filed suit. Where there is no valid contract, there can be no breach of contract claim and, therefore, no waiver of governmental immunity. The trial court agreed with the District, finding (1) the District's declaration meant the contract was void from its inception regardless of the date of the declaration; (2) in the absence of a valid contract, no waiver of governmental immunity could be shown; and (3) where no waiver was demonstrated, BTC's claims were barred. The trial court then granted the plea, dismissing BTC's breach-of-contract claims with prejudice.

## II. ISSUES ON APPEAL

On appeal, BTC argues the trial court erred in granting the District's plea to the jurisdiction, because BTC presented a fact issue as to whether the District waived governmental immunity the moment it entered into the contract, per Chapter 271 of the Texas Local Government Code. In sub-issues, BTC argues when and whether to waive governmental immunity is the Legislature's exclusive province; thus, the District's delay in "voiding" the contract presents a fact issue as to whether such a declaration was even valid, especially where BTC allegedly "cured" the statutory violations. BTC further contends Chapter 176 includes no basis for the District's declaration that the contract was void from inception. Finally, BTC argues the District's delayed declaration imposes an "extremely unconscionable penalty" for BTC's alleged disclosure violations, where BTC's costs exceeded $1 million at the time the declaration was made.

## III. DISCUSSION

### A. Standard of review

Public school districts are among those governmental entities generally immune from suit absent a legislative waiver. *El Paso Education Initiative, Inc. v. Amex Properties, LLC*, 602 S.W.3d 521, 526 (Tex. 2020); *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012)).

7

Unless immunity has been waived, governmental immunity protects the entity and deprives the courts of jurisdiction. *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014). Because immunity implicates a trial court's subject matter jurisdiction, the issue is properly raised through a plea to the jurisdiction, which we review de novo. *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528 (Tex. 2022).

The party suing the governmental unit bears the burden of affirmatively showing a waiver of immunity exists. *Univ. of Texas M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 512 (Tex. 2019) (citing *Texas Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001)). "To determine whether the party has met this burden, we may consider the facts alleged by the plaintiff and the evidence submitted by the parties." *Id.* (citing *Texas Nat. Res. & Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex. 2001)).

When the plea challenges the existence of jurisdictional facts, our review mirrors that of a traditional summary judgment motion. *Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 635 (emphasis added); *see also* Tex. R. Civ. P. 166a(c). Thus, while considering evidence, we take as true all evidence favorable to the non-movant and indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). Dismissal on a plea to the jurisdiction is improper where the pleadings and evidence generate a "fact question on jurisdiction." *Univ. of Texas at Austin v. Hayes*, 327 S.W.3d 113, 116 (Tex. 2010). Where the relevant evidence is undisputed or the plaintiff fails to raise a fact question on the jurisdictional issue, however, the plea must be granted. *Id.* at 116.[9]

---

[9] *Cf., Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012) (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000), *overruled on other grounds*, *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 n.4 (Tex. 2004)) (confirming a plea to the jurisdiction generally defeats an action "without regard to whether the claims asserted have merit").

### B. Conflict of interest disclosure requirements and enforcement

Chapter 176 of the Texas Local Government Code was enacted in 2005 to ensure the disclosure of business and financial relationships between public officials and potential vendors, promoting ethics in the local contracting marketplace and protecting taxpayers from the costs of bribery and corruption in that process. *See* Act of May 26, 2005, 79th Leg., R.S., ch. 1014, § 1, 2005 Tex. Gen. Laws 3429, 3429 (codified at Tex. Loc. Gov't Code Ch. 176).

Relevant here are portions of Chapter 176 which instruct that a vendor who contracts with, or actively seeks to contract with, a local government entity for the sale of property, goods or services must timely file a CIQ disclosing gifts (with an aggregate value of more than $100) to any officer of the local entity within the preceding 12 months. *See* Tex. Loc. Gov't Code Ann. §§ 176.003(a)(2)(B), 176.006(a), (a-1). Under Chapter 176, the vendor *shall* file a completed CIQ with the appropriate records administrator of the entity not later than the seventh business day after *the later of* the date the vendor: (1) begins discussions or negotiations to enter into a contract with the local government entity; or (2) submits to the local governmental entity an application, response to a RFP or another writing related to a potential contract with the local governmental entity. *Id.* §§ 176.006(a), (a-1)(1); 176.003(a)(2)(B). The statute further requires the vendor to file an updated CIQ "not later than the seventh business day after the date on which the vendor [first] becomes aware of an event that would make a statement in [a prior] questionnaire incomplete or inaccurate." *Id.* § 176.006 (d).

In 2015, based on concerns that disclosures were not sufficiently being triggered, the Legislature amended Chapter 176 to include enforcement provisions, creating a criminal offense and penalties for the failure to disclose. *See* Act of May 27, 2015, 84th Leg., R.S., ch. 989, § 8, 2015 Tex. Gen. Laws, 3508, 3512 (codified at Tex. Loc. Gov't Code Ann. § 176.013) (and Bill Analysis at https://lrl.texas.gov/scanned/TLCBillAnalyses/84-0/HB23RPT.PDF). Accordingly,

9

under the "Enforcement" section, a vendor has committed a criminal offense if he knowingly fails to file (1) the required CIQ with the appropriate administrator not later than 5 p.m. on the seventh business day after the date on which the vendor becomes aware of the facts that require the filing of the questionnaire; or (2) an updated CIQ not later than 5 p.m. on the seventh business day after the date on which the vendor becomes aware of an event that would make a statement in a previously-filed questionnaire incomplete or inaccurate. *See* Tex. Loc. Gov't Code Ann. §§ 176.013(b)(1), (2). Where, as here, the contract amount is at least $5 million, the offense is a Class A misdemeanor unless the vendor files a CIQ within seven business days of its first notice of the violation. *Id*. at §§ 176.013(c)(3), (g). Absent the amendment-within-seven-days exception, a vendor who violates Chapter 176 in that scenario does so at the risk of spending one year in jail, being fined a maximum of $400, or both. *See id*. § 176.013(c)(3); Tex. Penal Code Ann. §§ 12.21.

Significant here, Chapter 176's enforcement provisions also include a civil penalty: the governing body of a local governmental entity may, at its discretion, declare a contract void if it determines that a vendor failed to file a CIQ. *See* Tex. Loc. Gov't Code Ann. § 176.013(e).

## C. Analysis

### (1) Did BTC comply with Chapter 176 disclosure requirements?

Under Chapter 176, BTC's first disclosure duty arose when it became aware that it had distributed gifts to District officers (or officers' family members) valued in the aggregate of $100 or more in the 12 months preceding BTC's response to the District's RFP. *See id.* §§ 176.006(a), (a-1)(1)(B). The mandatory deadline for those disclosures was Wednesday, December 14, 2022, or the seventh business day after BTC responded to the District's RFP on Monday, December 5, 2022.[10] *See id.* §§ 176.006(a-1)(1)(B). This BTC failed to do.

---

[10] The record and briefing interchangeably indicate BTC's response to the District's RFP occurred on December 2, 2022, and December 5, 2022.

Instead, while otherwise appearing to meet the deadline, BTC's December 2, 2022 CIQ made no mention of the several expensive gifts BTC had distributed to District employees and officials during the applicable timeline. Indeed, BTC president Sammy Martin represented *under oath* that "No Relationship Exists [between BTC and the District]." Just above Martin's signature, the box to be checked "if the vendor has given the local government officer or [the officer's family member] one or more gifts [with an aggregate value of $100 or more]" was left blank. Remarkably, BTC's sworn statement that no disclosures were necessary was filed just over a month after BTC gifted Dallas Cowboys tickets and suite access to the District's then superintendent and business manager; and just 15 days before BTC provided limousine transport services to the same now-former employees.

A second statutory disclosure duty arose when any particular "event" triggered BTC's awareness that its December 2, 2022 CIQ was "incomplete or inaccurate." *See id.* § 176.006(d). In that circumstance, Chapter 176 essentially allowed BTC a second chance: BTC could have amended its prior CIQ by Tuesday, December 13, 2022, or the seventh business day after BTC filed its "no disclosures" CIQ on Friday, December 2, 2022. Despite evidence confirming both its professional awareness of the statutory requirements and its actual awareness of its distribution of gifts-requiring-disclosure in the applicable timeline, BTC remained silent. On that basis, BTC filed no CIQ and no supplemental CIQ meeting Chapter 176's mandatory December 2022 deadlines.

On the pivotal issue of whether BTC was actually aware of, but failed to comply with, the Chapter 176 mandates for conflict-of-interest disclosures, the trial court also had the following evidence before it:

- At the time it submitted the December 2022 CIQ, BTC had over 40 years of experience in the education construction industry, and held itself out as Texas's "premier K-12 education construction manager;"

11

- BTC had notice of the mandated disclosures at least three times before it responded to the District's RFP: BTC included the blank CIQ form in its proposed Request for Qualifications to the District on November 9, 2022; the District's publicly released RFP included the Chapter 176 mandate that all proposers execute the CIQ under oath; and it received the CIQ form when the District addressed the RFP directly to BTC on November 18, 2022;

- District officials and Board members filed Chapter 176-compliant disclosures confirming BTC's gifts of limousine transport, suite access, parking passes and tickets to NASCAR events and Dallas Cowboys games in the applicable pre-contract timeline;

- BTC's electronic mail communications contained details of the gifts to various District officials confirming BTC's actual knowledge of the gifts and the timeline of their distribution;

- BTC's failure, in the December 2, 2022 CIQ, to disclose any of the gifts it had distributed to District officials in the applicable timeline constituted a false statement under oath; and

- Listing only six of nine known gifts to the District, BTC's supplemental November 30, 2023 CIQ, filed under oath, also constituted a false statement under oath.

Based on the foregoing, the trial court could have reasonably concluded that BTC, an experienced professional in the construction industry, had actual awareness of the Chapter 176 disclosure mandates prior to and during its efforts to obtain the District contract. The trial court could have then reasonably found that BTC's failure to comply with statutory mandates by disclosing their gifts to District officials in the 2021–2022 timeline was not inadvertent, but intentional.

BTC contends, however, that it was "unaware" of any statutory violations until it received the District's November 29, 2023 pleadings advising the contract had been voided. Because BTC

supplemented its prior disclosures the next day, BTC argues any violation was cured under what it calls Chapter 176's "safe harbor" provision: "[i]t is an exception [to the vendor's commission of an offense for failures to disclose if][11] the vendor filed the required questionnaire not later than the seventh business day *after the date the vendor* [*first*] *received notice from the local governmental entity of the alleged violation.*" *See* Tex. Loc. Gov't Code Ann. § 176.013(g) (emphasis added). Because the statute describes the "knowing failure" to file the requisite disclosures as a Class A, B, or C misdemeanor depending on the subject contract's monetary value, the exception provision is clearly intended as a defense in a criminal proceeding.

Moreover, the exception provides a grace period after a vendor's *first notice of a violation* from the government entity. Considering BTC's claims that it filed supplemental CIQs in April and May, 2023 (the precise timeline in which the District first learned of and made inquiries to BTC about the illegal gifts), and the previously discussed evidence of BTC's actual knowledge of the disclosure requirements, BTC's attempts to frame the District's November 29, 2023 pleadings as its "first notice" of any statutory violations stretch the boundaries of credibility.

Sub-issue D. of BTC's point of error which argued BTC legally cured, or presented a fact issue as to whether it legally cured, any Chapter 176 violations, is overruled.

### (2) Did Chapter 176 authorize the District to void the contract *ab initio*?

Section 271.152 of the Texas Local Government Code (Chapter 271) provides that, when a local government entity (including an independent public school district), authorized to contract, "enters into a contract" for goods or services that meet certain requirements, that entity "waives

---

[11] *See* Tex. Loc. Gov't Code Ann. § 176.013(b) ("A vendor commits an offense under this chapter if the vendor: (1) is required to file a conflict of interest questionnaire under Section 176.006; and (2) either: (A) knowingly fails to file the required questionnaire with the appropriate records administrator not later than 5 p.m. on the seventh business day after the date on which the vendor becomes aware of the facts that require the filing of the questionnaire; or (B) knowingly fails to file an updated questionnaire with the appropriate records administrator not later than 5 p.m. on the seventh business day after the date on which the vendor becomes aware of an event that would make a statement in a questionnaire previously filed by the vendor incomplete or inaccurate.")

13

sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of [the Act]." *See* Tex. Loc. Gov't Code Ann. §§ 271.152, 151(2), (3). For a waiver of immunity, however, there must be "a written contract . . . that is properly executed on behalf of the local governmental entity." *See* Tex. Loc. Gov't Code Ann. § 271.151(2); *El Paso Education Initiative*, 602 S.W.3d at 531. "[A] contract is *properly* executed when it is executed in accord with the statutes and regulations prescribing [the entity's contracting authority]." *El Paso Education Initiative*, 602 S.W.3d at 532 (confirming Chapter 271's use of the word "properly" limits the verb "executed," leading to the "inexorable conclusion that not all executed contracts qualify for Chapter 271's waiver").

It is undisputed that the District, a local government entity authorized to contract under Chapter 271, entered into a contract with BTC in January 2023. The District, however, insists the waiver applies only to a lawful, valid contract. By choosing to void the contract under Chapter 176's enforcement authority, the District argues no valid contract existed when BTC filed suit. *See* Tex. Loc. Govt. Code Ann. §§ 176.013(b), (e). Where there is no contract, there can be no breach of contract claim. *See Mullins v. TestAmerica*, *Inc.*, 564 F.3d 386, 418 (5th Cir. 2009); *Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 354–55 (Tex. App.—San Antonio 1998, pet. denied) (confirming the existence of a valid contract is an essential element of a breach of contract claim). And where there is no valid breach of contract claim, BTC cannot meet its burden to establish waiver. *El Paso Education Initiative, Inc.*, 602 S.W.3d at 534.

BTC claims the District misconstrues the statute's meaning of the word "void," claiming (1) the statute's inclusion of the phrase "at [the entity's] discretion" necessarily means the entity may only declare a contract *voidable*; and (2) nowhere does the statute authorize a declaration that a contract is void from inception. We turn, then, to the rules of statutory interpretation.

A court's mandate is always "to ascertain and give effect to the Legislature's intent as expressed in the statutory language." *Texas Health and Human Servs. Comm'n v. Estate of Burt*, 689 S.W.3d 274, 282 (Tex. 2024) (citing *Paxton v. City of Dallas*, 509 S.W.3d 247, 256 (Tex. 2017)). We therefore consider the plain and ordinary meaning of the term, "unless a different meaning is supplied, is apparent from the context, or the plain meaning of the word[] leads to absurd or nonsensical results." *Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017) (citing *Crosstex Energy Services, L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014)); *see also* Tex. Gov't. Code Ann. § 311.011(a). ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). We also consider the context in which the word is used, determining "legislative intent from the entire act and not just [from] isolated portions." *See 20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008).

Black's Law Dictionary defines the adjective "void" as "of no legal effect; to null." *Void*, BLACK'S LAW DICTIONARY (12th ed. 2024). As an example, Black's states "whenever technical accuracy is required, *void* can be applied only to those provisions that are of no effect whatsoever—those that are an absolute nullity." *Id.* Generally, a contract may either be void and a nullity *from its inception*, or voidable. *See Willacy County Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 555 S.W.3d 29, 52 (Tex. 2018) (citing *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied)). Before one can sue for breach of contract, there must first be a contract susceptible of breach. *Bannum, Inc. v. Mees*, No. 07-12-00458-CV, 2014 WL 2918436, at *1 (Tex. App.—Amarillo June 24, 2014, no pet.) A contract rendered "null and void" is not susceptible of breach "because a void contract never came into existence." *Id*. (citing *Elijah Ragira/VIP Lodging Group, Inc. v. VIP Lodging Group, Inc.*, 301 S.W.3d 747, 754 (Tex. App.— El Paso 2009, pet. denied)).

15

The language used in the subject enforcement provision is clear and unambiguous. *See* Tex. Loc. Gov't Code Ann. § 176.013(e); *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 445 (Tex. 2009) (Hecht, J., concurring) (confirming that, if the language used in the statutory text is "plain enough, . . . that is where the task [of statutory interpretation] ends.") The critical word selected by the Legislature is "void," not "voidable" as BTC suggests. No other statute or section is noted or cross-referenced to indicate a timeline in which the government entity may *or may not* declare a contract void. *See Willacy County*, 555 S.W.3d at 39 (confirming courts presume the Legislature selects each word of the statute for a purpose, and that it purposefully omits those words not chosen). Thus, according to the plain language of the statute, the District's timeline in which to void a contract was not limited by BTC's alleged prior contract termination or the date BTC filed suit.

When Chapter 176 was amended in 2015, the Legislature intentionally infused it with more enforcement "teeth." Section 176.013 clearly outlines the applicable criminal offense and designates misdemeanor offense levels based on the subject contract's monetary value. In the civil realm, however, the Legislature chose only to authorize one remedy, allowing a government entity the discretion to void any contract associated with a vendor's failure to make the statutory disclosures. *See City of Denton v. Municipal Admin. Servs., Inc.*, 59 S.W.3d 764, 769–70 (Tex. App.—Fort Worth 2001, no pet.) (citing *Richmond Printing v. Port of Houston Auth.*, 996 S.W.2d 220, 224 (Tex. App.—Houston [14th Dist.] 1999, no pet.)) (confirming a contract made in violation of a statute is illegal); *cf., TXU Energy Retail Co., LLC, v. Fort Bend ISD*, 472 S.W.3d 462, 466 (Tex. App.—Dallas 2015, no pet.) (citing Tex. Loc. Gov't Code Ann. § 271.152) (affirming trial court grant of plea to jurisdiction; school district not authorized to enter into contract where provider violated competitive bidding requirements). Consistent with the Legislature's intent to prevent corruption and prohibit contracts solicited in violation of the

16

disclosure mandates, we conclude that § 176.013 authorized the District to declare the contract void from inception, confirming no valid contract existed when BTC filed suit and, thus, no waiver of governmental immunity.

As a last resort, BTC attempts to frame this outcome as "unconscionable" due to the substantial penalty it will likely sustain. That argument requires a finding that the District is estopped from voiding the contract; estoppel doctrines, however, will not make a void contract enforceable. *City of Denton*, 59 S.W.3d at 771.

Sub-issues A, B, and C of BTC's point of error are overruled.

## IV. CONCLUSION

Chapter 176 was enacted both to promote ethics in the public contracts marketplace and to protect Texas taxpayers from the expense of corruption and bribery in the process. BTC's conduct, amply affirmed by the record, is precisely the type of behavior Chapter 176 was enacted to curtail. We affirm the trial court's grant of the District's plea to the jurisdiction and its dismissal of the entirety of BTC's claims with prejudice.

MARIA SALAS MENDOZA, Chief Justice

April 21, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.
Soto, J., concurring without written opinion