**Affirmed and Opinion Filed August 1, 2022**

# S

**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

### No. 05-20-00550-CV

**CITY OF DALLAS, TEXAS, Appellant**
**V.**
**TRINITY EAST ENERGY, LLC, Appellee**

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-01443**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Nowell

The City of Dallas appeals from a judgment awarding Trinity East Energy, LLC (Trinity) damages for the regulatory taking of its rights to produce minerals under oil and gas leases within the City by failing to approve special use permits necessary to drill gas wells inside the City. Because the evidence is sufficient to support the trial court's finding of a regulatory taking and the jury's determination of the fair market value of the property taken, we affirm the trial court's judgment

on the regulatory taking claim. We need not address the remaining issues.[1] TEX. R. APP. P. 47.1.

## Background

In 2007, after identifying potential sites for gas exploration, the City issued a request for proposals to lease several thousand acres owned by the City for gas well drilling and production. The request for proposals included City-owned property located on the western edge of the City and within the Barnett Shale area of play. Trinity successfully bid for two groups of properties, identified as the Group 1 and Group 2A properties. The trial court's judgment for a regulatory taking applies only to the Group 1 Lease (hereinafter the "Lease").

The City designated a single tract as an available drill site location in the request for proposal. Trinity held several mineral leases near the area included in the City's request for proposals. Trinity responded to the request for proposal and indicated it had over twenty drill sites on other acreage and estimated that approximately ninety percent of acreage included in the request for proposals was drillable from Trinity's drill sites and the site offered by the City. Trinity's response also stated that it was in the process of obtaining seismic information on the area and after analyzing that data planned to drill a science well to evaluate the entire Barnett

---

[1] Trinity sued the City on multiple causes of action. The trial court awarded judgment on the regulatory taking claim for the fair market value of the property as found by the jury and an alternative judgment based on the jury's findings of liability and damages for statutory fraud and negligent misrepresentation in the event the regulatory taking judgment is reversed. The City brings ten issues on appeal, attacking both portions of the judgment.

–2–

Shale and underlying formations and the potential for the area. After analyzing the results of the data obtained, Trinity would design and implement a continuous drilling program using multiple drilling rigs.

After winning the bid, Trinity performed comprehensive title work and determined the City owned an additional tract in the area, referred to as the Radio Tower tract. During negotiations for the final terms of the Lease, Trinity insisted that the Radio Tower tract be included in the Lease as a drill site location. Trinity determined that the units that could be formed from the Radio Tower tract were important acreage in Dallas and extending into Las Colinas and Irving. Trinity's former president, Steve Fort, described the area as the "heart of the play." He explained that Trinity had difficulty obtaining drill sites in Las Colinas but the Radio Tower site would allow development in that area. Trinity also identified another tract, known as the Gun Club, as a drill site location. The City ultimately agreed to include the Radio Tower and Gun Club sites in the Lease, but only as proposed drill site locations.

Trinity continued its seismic work and due diligence while negotiating the final terms of the Lease. In May 2008, Trinity drilled a science well near the University of Dallas to obtain detailed information about the prospect of producing natural gas from the property. Based on information obtained from the science well and seismic data, Trinity determined that the area contained a producible type of Barnett Shale, similar to Barnett Shale in other highly productive areas. Fort testified

that the information from the science well confirmed that the City acreage was some of the best acreage in Trinity's group of leases.

Using the same well-bore as the science well, which was a vertical well, Trinity drilled a horizontal well to obtain production from the University of Dallas site. This well obtained gas production and a unit was formed around it. The unit included approximately 150 acres of land included in the Lease. Although the well produced some gas, it also produced significant amounts of water. The gas was also higher in carbon dioxide than allowed by Trinity's contract with Atmos Energy, requiring the gas to be mixed with other gas to meet the specifications. The well lost money and was later abandoned. Trinity attempted to drill another horizontal well from the same location but it was lost due to defective casing.

The City's drilling ordinance in effect at the time of the Lease required anyone desiring to drill an oil and gas well to obtain a special use permit (SUP) from the City. In addition, the lessee would be required to obtain several other permits or approvals before drilling and operating a well. Trinity's members were experienced oil and gas producers and familiar with the process for obtaining the permits and approvals necessary to drill wells. They had successfully obtained SUPs from other cities, including Fort Worth, Farmers Branch, and Irving. There was evidence that from 2007 to 2010, the City approved five SUPs for gas drilling by other developers on private property.

The City and Trinity signed the Lease in August 2008. Trinity paid the City a lease bonus of over $19 million, a 25% royalty on gas, and an overriding royalty interest on gas produced from other leases through wells on City drill sites. The Lease covered over 2,000 acres and identified one tract as a drill site location and three other tracts as proposed drill site locations, including the Radio Tower and Gun Club sites.[2]

On the same day the Lease was signed, Trinity and the City Manager signed an assurance letter stating that although City staff could make no guarantees, they were reasonably confident that Trinity would be granted the right to use the Radio Tower tract as a drill site and staff would use its reasonable efforts to assist Trinity in putting permits before the City Council and in obtaining other permits necessary to create a drill site and production facility on the Radio Tower tract. The letter acknowledged it was not a binding agreement but was a good faith representation of their discussions in connection with the transaction.

Trinity began the process of preparing for drilling operations. It performed engineering, surveying, and other work necessary for producing the minerals, including the design of drill site pads, pipeline alignment, archaeological and tree surveying, and seeking regulatory approval from federal, state, and local authorities, such as the Railroad Commission, the Army Corps of Engineers, and the City.

---

[2] Approximately 600 acres were later removed from the Lease by an amendment that also extended the primary term of the Lease.

By 2010, Trinity was ready to obtain the necessary permits from the City. Around the same time, the City was considering updating its gas drilling ordinance. City staff told Trinity that its regulatory applications would face delays due to reductions in City staff and recommended delaying the applications until after the May 2011 elections due to political concerns. However, Trinity faced a deadline to commence operations under the Lease by August 2011 and submitted SUP applications in March for drill site locations on the Radio Tower and Gun Club sites and on a privately owned tract known as Luna South. The trial court found that the SUP applications were filed in accordance with applicable law. In July 2011, the City and Trinity agreed to extend the primary term of the Lease for an additional thirty months.

City staff eventually recommended approval of the SUPs with several conditions. However, after Trinity submitted the applications, the City appointed a gas drilling task force to determine the future of gas drilling in the City, which resulted in a lengthy delay in considering the SUP applications. In December 2012, the City Planning Commission considered Trinity's SUP applications and denied them. Afterwards, an attorney for the City contacted Trinity about finding alternative sites for drilling. Several sites were discussed, but none were feasible. One was underwater, the land owner would not agree to surface drilling on another, and others were too remote from the high quality Barnett Shale reserves under the leased acreage.

Because the City Planning Commission denied the SUP applications, the City Code required a three-quarters vote of the City Council to overturn the planning commission decision. On August 28, 2013, the City Council voted on Trinity's appeal of the denial of the SUPs. A majority of the council voted to approve the SUPs, but the vote was less than the required three-quarters margin. As a result, the SUPs were denied. In December 2013, the City amended the gas drilling ordinance and imposed strict setback and other restrictions that would essentially preclude drilling on the Lease or within the City limits. The Lease subsequently expired and the mineral interest reverted to the City.

Trinity sued the City on several causes of action. The case was tried to the court and a jury in a single proceeding. Trinity presented evidence at trial that the fair market value of Trinity's leases that could be developed from the three drill sites was $26,580,000 to $40,698,000 before denial of the SUPs. It also presented evidence that after denial of the SUPs the property was worth nothing and the Lease expired.

The jury failed to find that the City breached the Lease, but found the City committed statutory fraud and negligent misrepresentation and awarded damages. Over the City's objection, the trial court submitted the question of the fair market value of Trinity's property before and after denial of the SUPs to the jury. The jury found the fair market value of Trinity's property before the denial of the SUPs was $33,639,000 and zero after the denial. The trial court determined that the City

committed a regulatory taking by failing to approve the special use permits and awarded Trinity compensation in the amount of $33,639,000. The trial court signed findings of fact and conclusions of law in connection with its regulatory taking findings.

## Standard of Review

In evaluating the legal sufficiency of the evidence to support a finding, we credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally insufficient when (a) evidence of a vital fact is completely absent; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). However, evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Serv. Corp. Intern. v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011).

In reviewing the factual sufficiency of the evidence, we review all the evidence and will set aside the finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly

wrong and unjust. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016). "[T]he jury is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Golden Eagle Archery, Inc., v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). It is up to the jury "to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses." *Ford v. Panhandle & Santa Fe Ry. Co.*, 252 S.W.2d 561, 563 (Tex. 1952).

Findings of fact made after a bench trial are of the same force and dignity as a jury's verdict and appellate courts review them under the same sufficiency standards as applied in reviewing the evidence to support a jury's verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *In re C.H.C.*, 392 S.W.3d 347, 349–50 (Tex. App.—Dallas 2013, no pet.).

The Constitution of the State of Texas states, "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." Tex. Const. art. I, § 17(a). The constitution waives governmental immunity for inverse condemnation claims. *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 236 (Tex. 2011). "Inverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by

the taking agency.'" *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012) (quoting *United States v. Clarke*, 445 U.S. 253, 257 (1980)).

To plead a claim for inverse condemnation, the claimant must allege an intentional government act that resulted in the uncompensated taking of his property. *City of Houston v. Carlson*, 451 S.W.3d 828, 831 (Tex. 2015). "A taking is the acquisition, damage, or destruction of property via physical or regulatory means." *Id.* "A regulatory taking is a condition of use 'so onerous that its effect is tantamount to a direct appropriation or ouster.'" *Id.* (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)).

**Discussion**

**A. Regulatory Taking**

In its first issue, the City contends that the evidence is legally and factually insufficient to support the trial court's finding of a regulatory taking.

Texas law recognizes several theories under which a claimant may allege a regulatory taking, including (1) a *Lucas* claim, in which a property owner alleges that a property regulation denied the owner of all economically beneficial or productive use of the property, *see Lucas v. S. Cent. Coastal Council*, 505 U.S. 1003, 1015–19 (1992); and (2) a *Penn Central* claim, in which a property owner alleges that, while a regulation did not deprive the owner of all economically viable use, the governmental action unreasonably interfered with the owner's use and enjoyment of his property, *see Penn Cent. Transp. Co. v. N.Y.C.*, 438 U.S. 104, 124 (1978)). *See*

*Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 838–39 (Tex. 2012); *City of Sherman v. Wayne*, 266 S.W.3d 34, 43–44 (Tex. App.—Dallas 2008, no pet.). The trial court's findings of fact and conclusions of law support either theory. Because we conclude the evidence supports the trial court's findings and conclusions on the *Lucas* theory, we do not discuss the *Penn Central* theory.

Under the *Lucas* theory, the question is whether the governmental regulation has deprived the owner of all economically viable use of his property. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935 (Tex. 1998). This requires determining whether any value remains in the property after the governmental action. *Id*.

The trial court found that other than the drill sites proposed in Trinity's three SUP requests, "Trinity did not have reasonable access to other surface locations from which it could have economically accessed the minerals under lands covered by [the] Group I Lease or under Trinity's private leases in the area of the property covered by the Group I Lease." The jury found that the fair market value of Trinity's property immediately after the City's non-approval of the SUPs was zero.

The City argues that denial of the SUPs did not deprive Trinity of all beneficial use of its property because there was evidence that Trinity had other drill sites from which it could have accessed at least some of the Lease acreage. The City also argues denial of the SUPs did not cause Trinity's damages because Trinity had access to these alternative drill sites. However, there was evidence the factfinder could

–11–

reasonably believe that none of the alternative drill sites were viable or feasible for economically developing Trinity's mineral property.

The City points to Trinity's 2007 response to the request for proposals where Trinity represented it could drill ninety percent of the Group 1 Lease area from Trinity drill sites along with the one drill site offered in the request for proposals. But Trinity stated in the same response that it was in the process of obtaining seismic data and drilling a science well to evaluate the prospect and that after analyzing this data it would propose a continuous drilling plan. After its bid was accepted, Trinity obtained additional seismic data, drilled the University of Dallas science well, and determined the best way to maximize the value of its mineral interest was to use the Radio Tower, Gun Club, and Luna South tracts as drill site locations from which it could drill several horizontal wells to produce gas from several units formed around the drill sites. This was the reason Trinity insisted that the Radio Tower and Gun Club tracts be included in the final Lease and the City agreed to include them as proposed drill sites. Furthermore, the City's petroleum engineer, Nick Steinsberger, analyzed the drill site locations referenced in Trinity's response to the request for proposals and testified that drilling from those drill sites would not have been productive or economic.

Next, the City argues that Trinity could have drilled on tracts where it had SUPs from Irving and Farmers Branch and it drilled three wells from the University of Dallas site in Irving that accessed some of the Lease acreage. But the City fails to

identify any evidence that these drill sites provided *reasonable* or economically viable access to all of Trinity's minerals. *See Mayhew*, 964 S.W.2d at 935 (regulatory taking occurs where regulation denies owner all economically viable use of property); *Tarrant Cty. Water Control & Improvement Dist. No. One v. Haupt, Inc.*, 854 S.W.2d 909, 911, 913 (Tex. 1993) (*Haupt II*) (under accommodation doctrine alternative means of producing minerals must provide mineral lessee with *reasonable* access to mineral estate). The unit formed around the one production well on the University of Dallas site included about 150 acres of the over 1400 acres in the Lease as amended. And, although the science well provided useful data to Trinity, the University of Dallas production well lost $11 million and was abandoned.

Trinity's geologist, Dennis Browning, testified that Trinity could not have used drill sites in Irving and Farmers Branch to drill a significant portion of the acreage included in the Lease. He explained that attempting to access that acreage from those sites would have required complex drilling and excessively long well bores. Trinity's expert, Richard Strickland, a petroleum engineer, testified that Trinity could not have fully developed its mineral interests from drill sites in Farmers Branch and Irving. He explained those sites would require excessively long well bores to reach the minerals and maximize the value of the asset.

The City also contends Trinity could have sought SUPs for different sites. Again, the City does not identify any evidence that Trinity would have been able to

obtain SUPs from the City for other sites or that any other sites would have permitted Trinity to reasonably and economically develop its mineral property. *See Haupt, Inc. v. Tarrant Cnty. Water Control & Imp. Dist. No. One*, 870 S.W.2d 350, 355 (Tex. App.—Waco 1994, no writ) (*Haupt III*) (holding evidence factually insufficient to support deemed finding that alternative means of production by directional drilling or platform drilling over water provided *reasonable access* to mineral estate).

Finally, the City argues Trinity was required to obtain regulatory approvals involving parkland and floodplain issues before it could drill. But there was evidence that Trinity was on track to obtain necessary approvals for drilling and could deal with the floodplain and parkland issues. Without the SUPs, however, Trinity could not drill at the three locations. And the City denied the SUP for Luna South, which was private property, not parkland, and not in the floodplain, which made it impossible for Trinity to drill from that location.

While the ultimate determination of whether there has been a regulatory taking is a question of law, we rely on the trial court to resolve factual disputes about whether the City's denial of the SUPs deprived Trinity of all economically viable use of its property. *See Mayhew*, 964 S.W.2d at 932–33 ("While we depend on the district court to resolve disputed facts regarding the extent of governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law."). The trial court resolved the factual disputes

–14–

regarding the extent of the City's regulation of drilling and the evidence supports its findings.

We conclude the evidence is legally and factually sufficient to support the trial court's finding that other than the three sites proposed in the SUPs, Trinity did not have reasonable access to other locations from which it could economically develop its mineral interests. Based on the evidence and the trial court's findings we agree with the trial court that the City's denial of the SUPs resulted in a regulatory taking of Trinity's property. We overrule the City's first issue.

## B. Value Expert and Sufficiency

In its second and third issues, the City argues that Strickland's testimony on market value was unreliable and therefore the evidence was insufficient to support the jury's value findings.

We review rulings on the admissibility of expert testimony for an abuse of discretion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). A party may also argue on appeal that an expert witness's testimony is unreliable and therefore insufficient evidence to support a verdict. *Id*. A challenge to the sufficiency of the evidence is reviewed under traditional sufficiency standards. *See City of Keller*, 168 S.W.3d at 827; *Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 615.

An expert witness may testify regarding scientific, technical, or other specialized matters if the expert is qualified, the expert's opinion is relevant, the opinion is reliable, and the opinion is based on a reliable foundation. *See* TEX. R.

EVID. 702; *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). Expert testimony is unreliable "if there is too great an analytical gap between the data on which the expert relies and the opinion offered." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904–05 (citation omitted). Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348-49 (Tex. 2015).

Courts rigorously examine the validity of the facts and assumptions on which expert testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions. *Whirlpool Corp.*, 298 S.W.3d at 637. Trial courts act as gatekeepers, screening out irrelevant and unreliable expert opinions. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 590 (Tex. 1999) (noting "the trial court is the evidentiary gatekeeper with the primary responsibility to screen out unreliable expert evidence"). An expert's "bald assurance" that they used an approved methodology is insufficient to show their opinion is reliable; the court must independently evaluate the underlying data in determining whether the opinion is reliable. *Kraft*, 77 S.W.3d at 808.

Strickland, a petroleum engineer specializing in reservoir engineering, testified he prepared a fair market value opinion on the acreage that could have been

developed from the three drill sites on which Trinity requested SUPs from the City. He valued two separate development plans to drill those sites. The first plan, called Scenario A, called for 59 wells to develop six units containing approximately 2,800 acres. The second plan, Scenario B, called for 29 wells to develop four units containing approximately 1,600 acres. Strickland opined on the fair market value of both scenarios using the comparable sales method and the discounted cash-flow method. He weighted the two methods at seventy-five percent for the comparable sales method and twenty-five percent for the discounted cash-flow method and arrived at a fair market value opinion for each scenario. Strickland then reduced that value to the acreage Trinity had under lease as of the date of the denial of the SUPs, August 28, 2013. Trinity had 51% of the acreage in Scenario A and 60% of the acreage in Scenario B under lease on that date. Strickland concluded the fair market value of Trinity's owned leases under Scenario A was $40,698,000 and under Scenario B was $26,580,00 before the denial of the SUPs. Strickland's opinion of the value of Trinity's leases after the City denied the SUPs was zero.

### 1. Proposed Units

The City argues that Strickland's opinion is not reliable because he included acreage Trinity did not have under lease in the units he evaluated around each of the drill site locations and Trinity could not have leased all the acreage in Strickland's proposed units. Strickland explained, however, that while he developed a value for units that could be produced from the drill sites, he also expressed a value opinion

limited to only the acreage Trinity had under lease at the time of the City denied the SUPs. Because Strickland's opinion identified the value of the acreage Trinity had under lease at the time of the taking, it is immaterial whether Trinity would have been able to lease additional land. Trinity sought only the fair market value of the acreage it had under lease at the time of the taking. There is no indication in the record that the jury was confused, as the City contends, because the proposed units included unleased acreage; the jury's finding was within the range of the two scenarios involving only the acreage Trinity had under lease.

The City criticizes some of the units Strickland considered in his scenarios because they did not conform to the pooling provision of the Lease. Under the terms of the Lease, units formed around drill sites located on City land had to include 50% of their acreage from the City Lease. Units for sites not on City land required 20% of their acreage from the City Lease. However, the Lease provides that these minimum amounts could be decreased with the written consent of the City. Further, the Lease provides that if "there is insufficient unpooled acreage available from the Land to make up 20% of the unit (or 50% if applicable), then the remaining portion of the Land may be included in the unit."

Trinity presented evidence that lessors are motivated to consent to units if those units are necessary to develop the minerals because development results in royalties for the lessor. While a particular unit might contain less than the amount required in the pooling provision, Strickland's proposed units collectively covered a

significant portion of the acreage in the Lease as amended. Thus, the jury could reasonably conclude that the City would have provided consent to form the units rather than leave portions of the Lease unproductive.

### 2. Comparable Sales

The City argues that the sales Strickland used in his comparable sales analysis were dissimilar to Trinity's properties because Strickland used producing properties while there was no production on Trinity's leases and the sales were too far away from Trinity's leases.

Using public data and, in two cases, data from the seller, Strickland identified twenty-five Barnett Shale transactions from 2004 to 2013. Strickland had enough information from the public record to allow him to use six of those sales as comparable to Trinity's leases. The six sales occurred from 2010 to 2013. Although he had more information about the two sales with data provided by the seller, he did not use those sales a comparables because they were from 2006 and 2008. Except for the 2006 sale, all of the sales he examined included both developed and undeveloped acreage.

Using data from the six sales, he determined a value per acre for the undeveloped acres and made downward adjustments. He excluded two of the six sales because they were outliers, one very low and one very high. He then averaged the remaining four sales and applied a ten percent discount to account for the uncertainty in the City acreage. Strickland used that value and compared it to the

two sales from 2006 and 2008 for which he had detailed information from the seller. One of those sales involved property that was completely undeveloped and he had information on the other of how the buyer and seller allocated the value between the developed and undeveloped acreage. He arrived at a value of $35,000 per acre. He used that value and calculated a net value for each of the two scenarios by subtracting leasing expenses and additional costs required for the City acreage that would not normally be included in comparable sales.

The trial court has broad discretion in determining whether comparable sales are similar to the land being valued and its ruling is reviewed only for an abuse of discretion. *Collin Cty. v. Hixon Family P'ship, Ltd.*, 365 S.W.3d 860, 868 (Tex. App.—Dallas 2012, pet. denied). Strickland used sales from the same time period as the taking and of the same type of asset, Barnett Shale acreage, as Trinity's leases. Although the six sales included both developed and undeveloped acreage, Strickland testified he extracted the undeveloped portion of the sales and used that in his evaluation. Strickland used only sales of Barnett Shale assets in his evaluation, explaining that the Barnett Shale is an unconventional reservoir and comparable sales need to be of a similar formation and similar characteristics.

The City argues that the sales were not in the vicinity of Trinity's leases. Strickland located four of the comparable sales on a contour map of Barnett Shale thickness. He explained that the Barnett Shale is present over a very wide area and he considered Barnett Shale acreage across several counties. The sales, although

located in Tarrant and surrounding counties, included acreage with similar thickness, three hundred to four hundred feet, as the Barnet Shale in the City acreage. We conclude that the distance of the comparable sales from Trinity's leases was a consideration for the jury in weighing the evidence and the trial court did not abuse its discretion by admitting the evidence. *See Hixon*, 365 S.W.3d at 870 (stating the jury should consider all factors "which would reasonably be given weight in negotiations between a seller and a buyer") (quoting *City of Austin v. Cannizzo*, 267 S.W.2d 808, 815 (Tex. 1954)). Even so, comparable sales need not be in the immediate vicinity of the subject land, so long as they meet the similarity test. *Id.*

On this record, we conclude the trial court did not abuse its discretion by admitting the evidence of comparable sales.

### 3. Discounted Cash Flow

The City contends that Strickland's discounted cash-flow analysis was not reasonably certain. *See Phillips v. Carlton Energy Group, LLC*, 475 S.W.3d 265, 279–80 (Tex. 2015) (holding lost profits cannot be recovered unless proven with reasonable certainty and this rule applies when lost profits are used to prove market value of property).

When comparable sales are not available or inadequate as a measure of market value, other methods may be used to estimate fair market value. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001). One method is the discounted cash-flow method or income approach. *Id.*; *Maguire Oil Co. v. City of*

*Houston*, 69 S.W.3d 350, 363–64 (Tex. App.—Texarkana 2002, pet. denied) (holding discounted cash-flow analysis provided some evidence of market value of leasehold in regulatory taking case involving revocation of permit to drill gas well). Strickland explained that the discounted cash-flow method uses the estimated future production, estimated future prices, and estimated costs of production to calculate the net income for the property. The net income is then discounted to present value.

To estimate future production, Strickland identified existing wells analogous to the wells Trinity would be drilling. He looked at wells that were close in geography, near DFW airport, and in geology, near Lone Star Park in Grand Prairie. Strickland testified that the closest wells to Trinity's leases were at DFW, but those wells were slightly shallower than the wells Trinity proposed and the thickness of the Barnett Shale was not as great. The wells near Lone Star Park were geologically similar in thickness and depth to the wells Trinity sought to drill. Trinity's development plan called for wells with approximately 6000 foot lateral lengths therefore Strickland selected existing wells with lateral lengths of 5000 to 7000 feet and which began producing in 2005 to 2010. He used historical production from the wells meeting these criteria and developed an average curve using both good and bad wells. He then used that average or type curve to estimate the production from the wells in each of his scenarios.

Strickland estimated future prices using price forecasts from several industry sources made in the summer of 2013. He testified that the expectation in the summer

of 2013 was that gas prices would continue to rise. He then used estimated costs of production for Trinity's proposed wells, including drilling and operating costs, water disposal, treatment of carbon dioxide, and costs for equipment and production facilities.

Using these estimates, Strickland calculated a gross revenue stream, reduced that to the interest Trinity held, then subtracted the cost data to arrive at a yearly net cash flow. He then calculated the present value of that cash flow using industry metrics for discount rates. Finally, Strickland applied a 70% discount as a risk factor for Trinity's property.

The City contends that Strickland's analysis was not reasonably certain because the only wells actually drilled, the University of Dallas wells, were not economic, Strickland's proposed wells would have the same problems as the University of Dallas wells, and gas prices had fallen since 2008.

There was significant conflicting evidence about whether Trinity's mineral interests would be productive; resolving those conflicts, however, was for the factfinder. *See Ford*, 252 S.W.2d at 563.

The Barnett Shale is bounded on the eastern edge by a formation known as the Ouachita Thrust. Geologists for Trinity and the City testified that in general wells drilled on or to the east of this thrust will be poor but wells drilled to the west will be good. The evidence indicates that Trinity's University of Dallas wells were on the Ouachita Thrust. Comparing to producing wells near Lone Star Park, Trinity

determined that wells drilled four to five thousand feet northwest of the University of Dallas drill site would be productive because they would be west of the Ouachita Thrust. Trinity selected the three drill sites in the SUPs for this reason. Strickland testified that based on the thickness of the Barnett Shale, the quality of the rock, and laboratory testing from the University of Dallas science well, the wells from Trinity's selected drill sites would have good productivity and an excellent chance of commercial gas production.

Although gas prices in 2013 had fallen from the highs of 2008, Strickland used publicly available price forecasts from 2013 in his calculations. Those forecasts would have been available to buyers and sellers at the time. Further, Strickland's testimony shows he took the additional costs associated with the University of Dallas wells into consideration in his analysis and included costs for water disposal and treatment of carbon dioxide, along with many other cost factors, in his calculations.

We conclude that the City failed to show that Strickland's discounted cash-flow analysis was not reasonably certain. *See Phillips*, 475 S.W.3d at 280 ("[W]hen evidence of potential profits is used to prove the market value of an income-producing asset, the law should not require greater certainty in projecting those profits than the market itself would.").

### 4. Summary

Ultimately, the jury was presented with conflicting evidence on whether Trinity's leases would be productive of gas had Trinity been permitted to drill from

–24–

the drill site locations. "[T]he question of market value is peculiarly one for the fact finding body." *Texas Pipe Line Co. v. Hunt*, 228 S.W.2d 151, 156 (Tex. 1950).

The jury is the sole judge of the weight and credibility of the evidence, may resolve conflicting evidence, and is free to accept or reject all or any portion of an expert's testimony. *See Jackson*, 116 S.W.3d at 761; *McGailliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *Ford*, 252 S.W.2d at 563. The jury also has discretion to award damages within the range of evidence presented at trial, so long as there is a rational basis for calculation. *See Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 402 S.W.3d 257, 265 (Tex. App.—Dallas 2013, pet. denied). The jury's finding may not be set aside because its reasoning in arriving at the amount of damages is unclear. *Baker v. Habeeb*, No. 05-16-01209-CV, 2018 WL 1835566, at *9 (Tex. App.—Dallas Apr. 18, 2018, pet. denied). And while uncertainty as to the fact of damages is fatal, uncertainty as to the amount of damages does not defeat recovery. *Phillips*, 475 S.W.3d at 279–80.

In this case, the City thoroughly cross-examined Strickland and Trinity's other witness about the complaints raised on appeal and presented those complaints to the jury. The jury exercised its broad discretion and found a value for Trinity's property within the range of projections supported by the evidence. *See Baker*, 2018 WL 1835566, at *9. We will not disturb the jury's resolution of the conflicts in the evidence and its determination of the credibility of the witnesses.

We conclude there is more than a scintilla of evidence supporting the jury's finding of the fair market value of Trinity's property before and after the denial of the SUPs. The evidence supporting that finding is not so weak as to render it clearly wrong and manifestly unjust. *See Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 615; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Accordingly, the evidence is legally and factual sufficient to support the trial court's award of damages for inverse condemnation to Trinity. We overrule the City's second and third issues.

## C. Submission of Value Question to the Jury

In its fourth issue, the City contends the trial court abused its discretion by submitting the fair market value questions to the jury before the court determined there had been a regulatory taking. The City argues the trial court should have bifurcated the trial and conducted a bench trial on the taking question before trying the issue of damages to the jury.

While bifurcation may be appropriate in many cases, there is no bright-line rule requiring it and the trial court has broad discretion in determining whether to bifurcate the trial of an inverse condemnation case. *See Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 556–57 (Tex. 2004); TEX. R. CIV. P. 174(b). This case involved multiple causes of action with different damage theories, multiple witnesses, and several days of evidence. As in *Gragg*, separate trials would have resulted in considerable and unnecessary repetition of the evidence. *Gragg*, 151 S.W.3d at 557. Further, the City has not shown it was prejudiced in any way by

submission of the value question to the jury before the court determined there had been a taking. We conclude the trial court was within its discretion to submit the question to the jury and require only a single presentation of the evidence. We overrule the City's fourth issue.

## Conclusion

We conclude the evidence is legally and factually sufficient to support the trial court's findings and conclusions that the City denied Trinity all economically viable or beneficial use of its property resulting in a taking of the property for public purposes. The constitution requires payment of just compensation for such a taking. We also conclude the evidence is legally and factually sufficient to support the jury's determination of the fair market value of Trinity's property before and after the taking. Accordingly, we affirm the trial court's judgment.

/Erin A. Nowell//
ERIN A. NOWELL
JUSTICE

200550f.p05

# S

## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CITY OF DALLAS, TEXAS,
Appellant

No. 05-20-00550-CV      V.

TRINITY EAST ENERGY, LLC,
Appellee

On Appeal from the 192nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-14-01443.
Opinion delivered by Justice Nowell.
Justices Myers and Osborne
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee TRINITY EAST ENERGY, LLC recover its costs of this appeal from appellant CITY OF DALLAS, TEXAS.

Judgment entered this 1st day of August, 2022.