

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00040-CV

HICKORY CREEK SPECIAL UTILITY DISTRICT AND THE FOLLOWING PERSONS IN
THEIR OFFICIAL CAPACITIES AS OFFICERS AND MEMBERS OF THE HCSUD BOARD
OF DIRECTORS, BRAD WHITE, BOYD ROBERTS, TAMMY CROSS, BRANDON LAMM,
FRANCES CAPLINGER, PHILLIP GEORGE, AND KEVIN RICHEY, Appellants

V.

HENRY MASTELLAR, Appellee

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CV-24-46917

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

This is an interlocutory appeal and cross-appeal from the trial court's ruling on a plea to the jurisdiction filed by Appellants, Hickory Creek Special Utility District (Hickory Creek) and its board of directors (the HC Board).[1]  In resolving the appeal, we construe an easement granted by Appellee Henry Mastellar to Hickory Creek for the purpose of providing water services. Seven years after Hickory Creek provided water services to Mastellar, Hickory Creek entered onto Mastellar's property again to tap into the existing water line and provide service to a neighbor.  Mastellar sued Hickory Creek for inverse condemnation, among other claims.  The trial court granted, in part, and denied, in part, the plea to the jurisdiction, and each party appealed the portion of the trial court's ruling contrary to its position.  We affirm.

### I.    Background

In late 2016, Mastellar and his wife contracted for water service to their rural property located in Fannin County, Texas, to be provided by Hickory Creek.  Hickory Creek is a governmental entity created as a Special Utility District under Title 4, Chapter 65, of the Texas Water Code.  The Mastellars executed a Service Application and Agreement (Service Agreement) in December 2016, and the Mastellars granted an easement to Hickory Creek in February 2017 (Easement Agreement).

The Service Agreement included a provision referencing future easements, which stated:

The Customer shall grant to the District, now or in the future, any easements of right-of-way for the purpose of installing, maintaining, and operating such pipelines, meters, valves, and any other equipment which may be deemed

---

[1] The HC Board consisted of Brad White, Boyd Roberts, Tammy Cross, Brandon Lamm, Frances Caplinger, Phillip George, and Kevin Richey.

necessary by the District to extend or improve service for existing or future Customers . . . .

On the Service Agreement, Mastellar bracketed the above paragraph and handwrote above it: "HBM [Mastellar's initials] SPECIFIC EASEMENT NOT BLANKET EASEMENT." Mastellar and his wife executed the Service Agreement in December 2016, and Hickory Creek approved and accepted it on February 10, 2017.

Also on February 10, Mastellar and his wife executed the Easement Agreement, which included the following provisions:

> [The] . . . "Grantor" for the provision of utility service . . . does hereby covenant access to and grant, sell, and convey unto HICKORY CREEK SPECIAL UTILITY DISTRICT . . . an exclusive easement and right-of-way in, into, upon, across, and under the property described as A061 M MORGAN ACRES, 44.64 ACRES CR 4876 . . . .

> The right-of-way, easement, rights and privileges herein granted shall be used for the express purpose of providing water utility service including placing, installing, constructing, operating, repairing, inspecting, rebuilding, removing, and relocating water lines, transmission or distribution facilities or equipment, other utility lines, as well as reading any meter or performing any act related to the provision of the utility service. Hickory Creek SUD is specifically granted pedestrian, equipment and vehicular ingress and egress.

> The width of the easement shall be 20 feet, preferably one-half (1/2) such distance on either side of Hickory Creek SUD's lines, or other facilities, and shall include the subsurface below and the space above, more specifically described as: [with a horizontal line drawn in the blank provided for the specific description].

In April 2024, without contacting Mastellar, and for the purpose of tapping into the existing water line and providing service to Mastellar's neighbor, Hickory Creek, according to Mastellar,

> (a) removed a gate from its hinges located on the opposite side of [Mastellar's] Property, away from the [existing] water pipeline; (b) damaged the fence, which

3

is now unusable and needs to be replaced; and (c) drove many heavy vehicles and machines across [Mastellar's] Property, thereby making ruts and damaging [Mastellar's] Property and the coastal hay he was to harvest.

Mastellar sued Hickory Creek, claiming the installation of the additional water line was not authorized under the Service Agreement or the Easement Agreement and that he had not consented to the waterline's installation. Mastellar argued that neither the Service Agreement nor the Easement Agreement allowed Hickory Creek to extend or change the boundaries of the twenty-foot easement around his water line or to use any portion of his property to provide services to other properties absent the granting of an additional easement.

Mastellar brought five causes of action: (1) a suit for declaratory and injunctive relief based on ultra vires acts taken by the HC Board, (2) inverse condemnation against Hickory Creek, (3) a suit for declaratory and injunctive relief against Hickory Creek based on violation of the agreements, (4) breach of contract against Hickory Creek, and (5) violation of the Texas Tort Claims Act (TTCA) against Hickory Creek in the form of negligence arising from the use of a motor-driven vehicle.

Hickory Creek and the HC Board responded with a plea to the jurisdiction and motion to dismiss. With respect to Mastellar's declaratory judgment causes of action, the HC Board contended it did not commit any ultra vires acts, and Hickory Creek argued Mastellar cannot ask the trial court to determine the parties' rights under a contract that is unenforceable due to sovereign immunity. Hickory Creek argued Mastellar's inverse condemnation claim fails because there was neither damage nor a "constitutional taking." Finally, Hickory Creek asserted Mastellar's TTCA claim was barred because it did not adequately allege a negligence claim.

4

Based on their plea to the jurisdiction, Hickory Creek and the HC Board moved to dismiss Mastellar's case.

The trial court held a non-evidentiary hearing on Hickory Creek and the HC Board's plea to the jurisdiction. After the hearing, the trial court issued an order granting, in part, and denying, in part, their plea to the jurisdiction. The trial court granted their plea to the jurisdiction on both of Mastellar's requests for declaratory and injunctive relief and his cause of action for breach of contract and dismissed those causes of action. The trial court denied their plea to the jurisdiction on Mastellar's causes of action for inverse condemnation and violation of the TTCA.

Hickory Creek and Mastellar appealed the interlocutory order under Section 51.014 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (Supp.).

## II. Standard of Review

"Whether a court has subject matter jurisdiction is a question of law we review de novo." *Tex. Disposal Sys. Landfill, Inc. v. Travis Cent. Appraisal Dist.*, 694 S.W.3d 752, 757 (Tex. 2024) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

## III. Sovereign Immunity and Pleas to the Jurisdiction

"Sovereign immunity, unless waived, shields the state from lawsuits for damages." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012). Special Utility Districts are "one of thirteen different types of general law water districts acting as state political subdivisions," *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 835 (Tex. 2010) (citing TEX. WATER CODE ANN. §§ 50–68), and "[a]s such, they enjoy governmental

5

immunity from suit, unless immunity is expressly waived," *id.* at 836 (citing *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006)); *see Baylor Cnty. Special Util. Dist. v. City of Seymour*, 709 S.W.3d 5, 14 (Tex. App.—Eastland 2025, pet. filed).

"Immunity from suit may be asserted through a plea to the jurisdiction . . . ." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). "[P]leas to the jurisdiction may involve competing evidence, the denial of any probative evidence, or the assertion that the law compels a result regardless of the evidence." *City of Austin v. Powell*, 704 S.W.3d 437, 447 (Tex. 2024). "The foundational rule in all cases is that '[a] party suing the governmental unit bears the burden of affirmatively showing waiver of immunity.'" *Id.* (alteration in original) (quoting *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528 (Tex. 2022)). "There is 'a presumption against any waiver until the plaintiff establishes otherwise.'" *Id.* (quoting *Rattray v. City of Brownsville*, 662 S.W.3d 860, 866 (Tex. 2023)). "The plaintiff—the nonmovant— survives the plea to the jurisdiction only by showing that the statute 'clearly and affirmatively waive[s] immunity' and by also 'negating any provisions that create exceptions to, and thus withdraw, that waiver.'" *Id.* (alteration in original) (quoting *Rattray*, 662 S.W.3d at 867).

"In reviewing a grant or denial of a plea to the jurisdiction, we determine whether the plaintiff's pleadings, construed in favor of the plaintiff, allege sufficient facts affirmatively demonstrating the trial court's jurisdiction to hear the case." *Hearts Bluff*, 381 S.W.3d at 476. "If evidence central to the jurisdictional issue is submitted, it should be considered in ruling on the plea to the jurisdiction." *Id.*

## IV. Analysis

Through their appeals, the parties urge error with respect to each of the trial court's determinations against them. That is, Hickory Creek complains that the trial court erred in denying its plea to the jurisdiction on Mastellar's inverse condemnation and TTCA claims. Mastellar asserts on cross-appeal that the trial court erred in granting the plea as to his claims for declaratory and injunctive relief and breach of contract. We first address Hickory Creek's issues.

### A. Inverse Condemnation

"Article I, Section 17 [of the Texas Constitution] provides: 'No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . . .'" *Commons of Lake Houston, Ltd. v. City of Houston*, 711 S.W.3d 666, 675 (Tex. 2025) (quoting TEX. CONST. art. I, § 17(a)). "This provision of the Texas Bill of Rights reflects that the 'right to own, use, and enjoy one's private property is a fundamental right,' . . . and 'among our most cherished liberties . . . .'" *Id.* (citations omitted) (quoting *City of Baytown v. Schrock*, 645 S.W.3d 174, 179 (Tex. 2022) (citing *Hearts Bluff*, 381 S.W.3d at 476 (first quote)); *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014) (second quote)). "But the clause does not prohibit the government from taking, damaging, destroying, or applying private property; it instead requires that any such action be for a public use and that the government adequately compensate the owner for the property taken." *Id.* (citing *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019)). "The clause thus seeks to balance a citizen's private-property rights against the 'inexorable' 'demands of progress' and the need to encourage 'public improvements' by requiring 'all citizens [to share]

7

equally in the cost of progress.'" *Id.* at 675–76 (alteration in original) (quoting *DuPuy v. City of Waco,* 396 S.W.2d 103, 106 (Tex. 1965)).

"Governmental immunity protects [Hickory Creek] against—and deprives the courts of jurisdiction over—this suit unless that immunity has been waived." *Id.* at 675 (citing *Carlson*, 451 S.W.3d at 830). "The Texas takings clause—Article 1, Section 17 of the Texas Constitution—waives [Hickory Creek's] immunity and establishes the courts' jurisdiction, but only if [Mastellar] has alleged a legally viable takings claim." *Id.* (citing *Carlson*, 451 S.W.3d at 830).

"An owner who believes the government has taken its property may bring an 'inverse' condemnation claim to recover adequate compensation." *Id.* at 676 (quoting *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 536 (Tex. 2013)). "Inverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.'" *Hearts Bluff*, 381 S.W.3d at 476 (quoting *United States v. Clarke*, 445 U.S. 253, 257 (1980)).

> To prevail on an inverse-condemnation claim, the owner must plead and prove that (1) the government engaged in affirmative conduct (2) that proximately caused (3) the taking, damaging, destroying, or applying (4) of specific private property (5) for a public use (6) without paying the owner adequate compensation (7) and did so intentionally or with knowledge that the result was substantially certain to occur.

*Commons of Lake Houston*, 711 S.W.3d at 676 (footnotes omitted) (citations omitted).

The parties here dispute the third element of the inverse-condemnation cause of action— essentially, whether Mastellar properly pleaded a compensable taking under these facts. Hickory

8

Creek claims there was no taking because the Easement Agreement between the parties was a blanket easement, "authoriz[ing] construction of water lines on any 20-foot-wide area of land crossing Mastellar's land, as long as the use is reasonable and necessary," including the installation of the neighbor's water line outside the twenty-foot area surrounding the original water line installed for Mastellar. Mastellar, on the other hand, claims that the Easement Agreement was not a blanket easement and was granted only for Mastellar's purposes, thus the placing of the neighbor's water line outside the area of the previous line constituted inverse condemnation.

In determining whether the facts pleaded by Mastellar constitute a taking, we must construe the Easement Agreement.

### 1. Construing the Easement Agreement

"When construing the terms of an easement, courts deploy the rules of contract interpretation and look to the easement's express terms to determine its scope." *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 686 (Tex. 2020) (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)). "As in contract interpretation cases, courts look to all of the language in the easement and harmonize its terms to give effect to all of the provisions." *Id.* (citing *Parks*, 1 S.W.3d at 101).

While we are to "construe a contract in a manner that gives 'effect to the parties' intent expressed in the text,' . . . we may also take into account 'the facts and circumstances surrounding the contract's execution.'" *Reider v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020) (quoting *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014)). "In that vein, Texas courts

9

have long recognized that, under appropriate circumstances, 'instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other.'" *Id.* (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)). "Where appropriate, 'a court may determine, as a matter of law,' that multiple separate contracts, documents, and agreements 'were part of a single, unified instrument.'" *Id.* (quoting *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840). "In determining whether multiple agreements are part and parcel of a unified instrument, a court may consider whether each written agreement and instrument was 'a necessary part of the same transaction.'" *Id.* (quoting *Bd. of Ins. Comm'rs v. Great S. Life Ins. Co.*, 239 S.W.2d 803, 809 (Tex. 1951)). "But when construing multiple documents together, courts must do so with caution, bearing in mind that tethering documents to each other is 'simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation.'" *Id.* at 94–95 (quoting *Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959)).

Here, the Easement Agreement and the Service Agreement were both executed by Mastellar and his wife. The Mastellars signed the Service Agreement on December 16, 2016, and Hickory Creek approved it on February 10, 2017, the same date the Mastellars signed the Easement Agreement and it was notarized. The Hickory Creek representative who signed the Service Agreement appears to be the same person who notarized the Easement Agreement. Both agreements deal with the provision of water services to the Mastellars. While neither agreement specifically references the other, the Service Agreement does address easements, requiring

10

Mastellar to grant Hickory Creek "any easements of right-of-way for the purpose of [providing water service] . . . which may be deemed necessary by the District to extend or improve service for existing or future Customers, on such forms as are required by the District." Under these circumstances, we conclude it was proper for the trial court to consider the Service Agreement together with the Easement Agreement in "ascertaining and giving effect to the intention of the parties." *Id.* at 95 (quoting *Miles*, 321 S.W.2d at 65); *see Parks*, 1 S.W.3d at 101–02 (considering together an easement agreement and a separate service agreement "in determining the intent of the parties" under the easement agreement).

The easement granted to Hickory Creek by Mastellar anticipated the "placing, installing, constructing, . . . rebuilding, removing, and relocating [of] water lines." Although there is no metes and bounds description specifying the location of the easement on the property, the Easement Agreement does define the width of the easement as being twenty feet. Looking to the Service Agreement for the parties' intent regarding the location of the easement, we find Mastellar's interlineation that states, "SPECIFIC EASEMENT NOT BLANKET EASEMENT." Mastellar initialed that handwritten provision, and Hickory Creek's representative later "*Approved and Accepted*" the Service Agreement.

We reject Hickory Creek's argument that the easement is a blanket easement, that is, "[a]n easement without a metes and bounds description of its location on the property,"[2] *Atmos*

---

[2]"Blanket easements have been commonly used in Texas history, particularly for long route utility projects such as pipelines and electric power lines. The purpose of a blanket easement is for the practical convenience of the easement holder to alter the exact location of the lines during construction." *Atmos Energy*, 598 S.W.3d at 446 (quoting 2 TEX. PRAC. GUIDE REAL ESTATE TRANS. § 15:19). "The flip side of the flexibility provided for a blanket easement is the loss of control of exclusive use which the landowner otherwise enjoys." *Id.* at 447 (quoting 2 TEX. PRAC. GUIDE REAL EST. TRANS. § 15:19).

*Energy Corp. v. Paul*, 598 S.W.3d 431, 446 (Tex. App.—Fort Worth 2020, no pet.) (alteration in original) (quoting *First Am. Title Ins. Co. of Tex. v. Willard*, 949 S.W.2d 342, 344 n.2 (Tex. App.—Tyler 1997, writ denied)), which would result in Hickory Creek's "right to lay an unlimited number of pipelines as it may reasonably demand across the entirety of [Mastellar's] property," *id.* at 447. Due to significant wording differences between the agreements at issue here and the one examined in *Atmos Energy*, we discount the value of *Atmos Energy* as precedent here. The contract in *Atmos Energy* involved a global description of the servitude, as did the agreement between Hickory Creek and Mastellar, but the *Atmos Energy* contract apparently did not have a provision specifying the width of the easement, nor did it have an empty blank intended for filling in the specific description of the location of the easement.

The presence of a defined width in the Easement Agreement indicated the parties' intent to limit Hickory Creek to a twenty-foot-wide easement for the purpose of providing water services, the location of which was determined by Hickory Creek's placement of Mastellar's water line. That intent is further reflected in Mastellar's indication in the Service Agreement that the easement was to be a specific easement rather than a blanket easement.

### 2. Application to Inverse Condemnation Claim

We have concluded that the parties' Service Agreement and Easement Agreement granted to Hickory Creek a twenty-foot-wide easement on Mastellar's property for the provision of utility services. Mastellar's live pleading alleged that Hickory Creek entered onto his property without contacting him; removed a gate; damaged a fence, his property, and his hay crop; and, without his authorization and outside the boundaries of the easement, "dug up portions" of his

12

property that he planned to develop for his own access purposes, to provide service to his neighbor, preventing his development plans.

Hickory Creek contends that Mastellar's allegations are insufficient because they are akin to diminution-in-value claims by businesses when one of several access points to a parking lot is modified or even cut off. *See, e.g.*, *City of San Antonio v. TPLP Off. Park Props.*, 218 S.W.3d 60, 66–67 (Tex. 2007) (per curiam) ("Closing an access point and merely causing diversion of traffic or circuity of travel does not result in a compensable taking."). Mastellar, though, asserts something different. He asserts that Hickory Creek put the new waterline in the area he told Hickory Creek he intended to develop, and by putting the waterline there, Hickory Creek has prevented him from developing that acreage. Thus, Mastellar's allegations are in the nature of a physical taking. *See Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 30 n.25 (Tex. 2024) (listing a case involving a drainage ditch among examples of physical takings). Indeed, Mastellar asserts, in inverse condemnation, that which has previously been the subject of direct condemnation. *See Coastal Indus. Water Auth. v. Celanese Corp. of Am.*, 592 S.W.2d 597, 600 (Tex. 1979) ("The Authority's statement alleged that it wished to acquire the water line easement 'for the transportation of water and other facilities and uses incidental thereto or in connection [with its water system]'" sufficiently alleged "the necessity of the taking" under the condemnation statutes of the time.). Hickory Creek's belief that it had been granted a blanket easement does not change things. *See Self*, 690 S.W.3d at 32. If the government's subjective belief could defeat an inverse condemnation claim, then "the government could bulldoze anyone's house without compensation simply by asserting a belief—even a wholly unsupported one—that it had

13

the legal right to do so, regardless of whether that assertion was later withdrawn or disproved."

*Id.*

Because we have determined that the Easement Agreement was not a blanket easement granting Hickory Creek access to Mastellar's entire property, we conclude Mastellar properly alleged a taking, and the trial court properly denied Hickory Creek's plea to the jurisdiction on that cause of action. *See Commons of Lake Houston*, 711 S.W.3d at 676.

We overrule Hickory Creek's first issue.

### B.        Negligence under the Texas Tort Claims Act

As discussed above, the Utility District enjoys sovereign immunity unless that immunity has been waived by the Texas Legislature. The Legislature has waived immunity under the TTCA in certain circumstances by providing that "[a] governmental unit in the state is liable for . . . property damage . . . proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if . . . the property damage . . . arises from the operation or use of a motor-driven vehicle or motor-driven equipment." TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(A); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 101.025.

Hickory Creek argues that Mastellar's pleading was inadequate to invoke the immunity waiver of the TTCA. We disagree. Mastellar claimed, in his live pleading, that Hickory Creek employees entered onto his property "and engaged in wrongful or negligent acts or omissions in connection with the installation of [his neighbor's water line] and the same proximately caused severe damage to [his] [p]roperty, crops, and personal property." Mastellar alleged that the damage "arose in connection with the employees' use or operation of trucks, excavators, and

14

other motor-driven vehicles and equipment." In connection with his TTCA claim, Mastellar incorporated his previous allegations, which, as discussed above, included the entry onto his property, damage to his fence, property, and hay crop, and digging up his property. With respect to the use of motor vehicles, Mastellar specifically alleged that Hickory Creek "drove many heavy vehicles and machines across [his] [p]roperty, thereby making ruts and damaging [his] [p]roperty and the costal hay he was to harvest."

We conclude these allegations sufficiently alleged Hickory Creek's wrongful or negligent acts arising in connection with the use of a motor-driven vehicle or equipment to establish waiver of immunity and support the trial court's denial of the plea to the jurisdiction. *See, e.g.*, *Rattray*, 662 S.W.3d at 871–73 (collecting cases regarding the "operation or use" of motor-driven vehicles or equipment).

We overrule Hickory Creek's second issue.

## C. Declaratory and Injunctive Relief

In his first cross-issue, Mastellar argues that the trial court erred when it granted Hickory Creek's plea to the jurisdiction regarding injunctive and declaratory relief against both Hickory Creek and the HC Board.

### 1. The HC Board

"[S]tate agencies . . . are immune from suits under the [Uniform Declaratory Judgments Act] unless the Legislature has waived immunity for the particular claims at issue." *Tex. Dept. of Transp. v. Sefzik*, 355 S.W.3d 618, 620 (Tex. 2011) (per curiam). However, "'*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state'

15

over one of its officials." *Phillips v. McNeill*, 635 S.W.3d 620, 628 (Tex. 2021) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). Thus, ultra vires suits are seen as an exception to sovereign immunity, *Sefzik*, 355 S.W.3d at 621, and "[i]t is . . . well settled that immunity does not bar ultra vires suits against state officials," *Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 183 (Tex. 2023).

"An *ultra vires* suit requires a plaintiff to 'allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Phillips*, 635 S.W.3d at 628 (quoting *Heinrich*, 284 S.W.3d at 372). "Action without legal authority occurs when 'a government officer with some discretion to interpret and apply a law . . . exceeds the bounds of his granted authority or if his acts conflict with the law itself.'" *Id.* (quoting *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) (plurality op.)).

Here, Mastellar claimed that the HC Board acted ultra vires by "approving the location and installation" of a water line on his property "outside the area conveyed to [Hickory Creek] via easement." Similarly, Mastellar's breach of contract claim alleged that Hickory Creek breached the agreements by "unilaterally choosing and approving the location and installation of the" neighbor's water line outside the boundaries of the easement.

Even though ultra vires suits are not barred by governmental immunity, "a party may not seek a declaratory judgment 'only in an attempt to have the trial court decide its breach-of-contract claim.'" *Town of Flower Mound v. Rembert Enters., Inc.*, 369 S.W.3d 465, 475 (Tex. App.—Fort Worth 2012, pet. denied) (quoting *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 860 (Tex. 2002)). "[D]eclaratory-judgment suits against state officials seeking

16

to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities are suits against the State" and "cannot be maintained without legislative permission." *IT-Davy*, 74 S.W.3d at 855, 856.

We agree with the HC Board that the crux of Mastellar's argument on appeal is that his neighbor's line was installed outside of the twenty-foot easement he granted under the Easement Agreement. Indeed, to reach the conclusion Mastellar seeks—that Hickory Creek "was *not* authorized to steal the use of his land"—the trial court would have to construe the agreements between the parties to determine whether Hickory Creek breached them or whether the HC Board committed ultra vires acts. "Thus, [Mastellar's] declaratory judgment claim is merely a recast of its breach of contract claim, and immunity has not been waived." *Rembert Enters.*, 369 S.W.3d at 476 (citing *City of Houston v. Williams*, 216 S.W.3d 827, 829 (Tex. 2007) (per curiam); *IT-Davy*, 74 S.W.3d at 860).

We conclude, then, that Mastellar's declaratory judgment cause of action against the HC Board was merely an attempt to "establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities" for which the HC Board's immunity was not waived. *See IT-Davy*, 74 S.W.3d at 855. Thus, the trial court properly granted the plea to the jurisdiction on this cause of action.

### 2. Hickory Creek

As stated above, "[S]tate agencies . . . are immune from suits under the [Uniform Declaratory Judgments Act] unless the Legislature has waived immunity for the particular claims at issue." *Sefzik*, 355 S.W.3d at 620. Mastellar's declaratory judgment action against Hickory

17

Creek sought declaration of the parties' rights under the Easement Agreement and the Service Agreement.

On appeal, Mastellar advances no argument that his breach of contract claim based on the Easement Agreement was wrongly dismissed. Further, we determine below that his breach of contract claim based on the Service Agreement was properly dismissed because the State did not waive immunity for a breach of contract action on that type of contract. Because both of Mastellar's breach of contract claims were properly dismissed, there is no basis for declaratory or injunctive relief on either contract, and Mastellar's claims for declaratory and injunctive relief against Hickory Creek were properly dismissed.

We overrule Mastellar's first cross-issue.

### D. Breach of Contract

In his second issue on cross-appeal, Mastellar claims the trial court erred when it granted Hickory Creek's plea to the jurisdiction as to his breach of contract claim. Mastellar notes that his live pleading asserts that Hickory Creek's general immunity from suit was waived because it entered into the Service Agreement with him.

Section 271.152 of the Texas Local Government Code states,

> A local government entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE ANN. § 271.152. A "[c]ontract subject to this subchapter" is "a written contract stating the essential terms of the agreement for providing goods or services to the local

18

governmental entity that is properly executed on behalf of the local governmental entity." TEX. LOC. GOV'T CODE ANN. § 271.151(2)(A).

The parties disagree here as to whether Mastellar provided any services to Hickory Creek under the Service Agreement that would waive immunity with respect to Mastellar's claim for breach of contract. Mastellar argues the Service Agreement "require[d] Mastellar to provide real, specific services that are not hypothetical and are affirmative in nature." Specifically, Mastellar claims the Service Agreement requires him to "(1) install, maintain, and test multiple pieces of equipment and machinery on Mastellar's land; (2) correct various plumbing practices as [Hickory Creek] desires; (3) take various actions that comply with implemented rationing programs; and (4) payment of a deposit, fees, and other charges to [Hickory Creek]."

The Texas Supreme Court has "taken a broad view of what 'services' encompasses, [under the Local Government Contract Claims Act], holding that it 'includes generally any act performed for the benefit of another.'" *Campbellton Rd., Ltd. v. City of San Antonio ex rel. San Antonio Water Sys.*, 688 S.W.3d 105, 122 (Tex. 2024) (quoting *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 629 (Tex. 2020)). "The only limitation our case law imposes is that the services must provide more than a mere 'indirect, attenuated benefit.'" *Id.* (quoting *San Antonio River Auth.*, 601 S.W.3d at 629).

The actions required of Mastellar under the Service Agreement do not include "services," as that term is defined, even broadly viewed, that inure to the benefit of Hickory Creek under Section 271.151. The Service Agreement requires Mastellar, under certain circumstances, to install thermal and/or pressure relief valves to prevent possible damage to his own "closed

19

system" or to install backflow devices to prevent cross-connection that is prohibited by state regulation. Mastellar has not explained how those acts provide any benefit to Hickory Creek. Further, complying with any future rationing program is a contingent act—not an act that is necessarily required by the Service Agreement—and even if it were, Mastellar has not explained how his compliance would benefit Hickory Creek. Finally, Mastellar has not explained how payment of a deposit, fees, and charges constitutes anything other than remuneration for the goods and/or services he is to receive from Hickory Creek under the Service Agreement.

We agree with Hickory Creek that the Service Agreement does not require Mastellar to "provide any meaningful goods or services" to Hickory Creek and instead "require[s] adherence to protocols to protect the water system and the public." Any benefit that inured to Hickory Creek under the Service Agreement was too indirect and attenuated to qualify as services under the Local Government Contract Claims Act. *See Lubbock Cnty. Water Control & Improvement Dist. v Church & Akin, L.L.C.*, 442 S.W.3d 297, 303 (Tex. 2014) ("When a party has no right under a contract to receive services, the mere fact that it may receive services as a result of the contract is insufficient to invoke chapter 271's waiver of immunity. At best, such services are only an 'indirect' and 'attenuated' benefit under the contract."); *Jonah Water Special Util. Dist. v. White*, No. 03-06-00626-CV, 2009 WL 2837649, at *3 (Tex. App.—Austin Aug. 31, 2009, pet. denied) (mem. op.) ("The contract at issue here [(a service agreement for provision of water services)] concerns the provision of services *by* a local government entity . . . *to* a member of the public; thus, section 271.152 does not waive [the local government entity's] immunity.").

20

We conclude that the Service Agreement between Hickory Creek and Mastellar does not require the provision of any services of the type for which the Texas Legislature intended to waive Hickory Creek's immunity under the Local Government Contract Act. As a result, Hickory Creek's immunity was not waived as to Mastellar's breach of contract claim, and the trial court properly granted Hickory Creek's plea to the jurisdiction on that claim.

We overrule Mastellar's second cross-issue.

## V. Conclusion

We affirm the trial court's rulings on Hickory Creek and the HC Board's plea to the jurisdiction.

Jeff Rambin
Justice

Date Submitted:    August 12, 2025
Date Decided:    August 29, 2025